**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William E. KLEINICKE, Appellant.**

Superior Court of Pennsylvania.

Argued March 9, 2005.

Filed March 8, 2006.

imposed after he was convicted of possession with intent to manufacture a controlled substance, marijuana, in violation of 35 P.S. § 780–113(a)(30). This conviction carried a five-year maximum sentence under 35 P.S. § 780–113(f)(2). Due to penalties applicable to possession of various amounts of marijuana imposed pursuant to 18 Pa.C.S. § 7508, Appellant's minimum sentence was increased to be coextensive with his maximum sentence.

¶ 2 In this appeal, we consider whether Appellant's sentence violated the Supreme Court's pronouncements in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). After careful review, we conclude that the principles for which these cases stand were not implicated because 18 Pa.C.S. § 7508 merely increased the minimum sentence and not Appellant's maximum term of imprisonment beyond the statutory maximum authorized by the jury's verdict under 35 P.S. § 780–113.[1] Therefore, we affirm.

¶ 3 On August 31, 2001, police executed a search warrant at Appellant's residence at 16651 Round Hill Church Road in Stewartstown, Hopewell Township, York County. The search warrant was based upon an affidavit of probable cause dated August 31, 2001, and prepared by Pennsylvania State Police Officer Craig B. Fenstermacher. The affidavit averred the following: Officer Fenstermacher met with a confidential informant ("CI") who knew Appellant, was aware that Appellant grew and sold marijuana from his residence, and had observed Appellant sell marijuana on at least fifteen occasions.

Douglas P. France, York, for appellant.

Scott A. McCabe, Asst. Dist. Atty., York, for Com., appellee.

BEFORE: HUDOCK, FORD ELLIOTT, JOYCE, ORIE MELVIN, KLEIN, BENDER, BOWES, GANTMAN, and PANELLA, JJ.

OPINION BY BOWES, J.:

¶ 1 William E. Kleinicke appeals from the judgment of sentence of five years imprisonment and a $50,000 fine that was

---

1. Recently, a unanimous panel, which consisted of Judges Lally–Green, Panella, and Kelly, came to the identical conclusion as this *en banc* panel regarding the impact of *Apprendi* and *Blakely* on another of Pennsylvania's mandatory minimum sentencing statutes, 42 Pa.C.S. § 9712. *Commonwealth v. Mitchell*, 883 A.2d 1096 (Pa.Super.2005).

Police confirmed Appellant's address through his driving record and within three days of August 31, 2001, conducted a controlled buy at that location utilizing the CI. Officer Fenstermacher also had spoken with Pennsylvania State Trooper Bradley Schriver, who had received information that Appellant was involved with controlled substances. Finally, approximately three years prior to the application for a search warrant, Officer Fenstermacher had been told by another confidential informant that Appellant was distributing marijuana from his residence. In fact, Appellant's criminal history indicated that he had been charged with possession of a controlled substance in 1985 and had been accepted into the accelerated rehabilitative disposition program at that time.

¶ 4 During execution of the warrant, police discovered a sophisticated marijuana-growing operation; they seized 693 marijuana plants from four areas of Appellant's property, including a shed, a room underneath his home, an outside field, and a room specially outfitted to grow marijuana. Appellant was arrested and charged with possession with intent to manufacture a controlled substance, marijuana, in violation of 35 P.S. § 780–113(a)(30). Of the 693 plants seized, fifteen plants were tested.

¶ 5 After pretrial hearings disposing of Appellant's request for suppression of the evidence, the case proceeded to trial where Appellant was convicted of violating 35 P.S. § 780–113(a)(30). In order to preserve his present sentencing challenge, Appellant asked that the jurors be polled as to the number of live plants he had possessed. Eleven jurors found that Appellant possessed 693 marijuana plants, but one juror concluded that the Commonwealth had only proven that Appellant possessed fifteen live marijuana plants, which was the number that actually had been tested.

¶ 6 Appellant proceeded to sentencing on January 31, 2003, where the sentencing court concluded that Appellant possessed 693 live plants. Based on this finding, Appellant was sentenced to a flat sentence of five years imprisonment and a $50,000 fine.[2] Following the denial of post-sentence motions, Appellant filed a direct appeal to this Court. A three-judge panel, with one judge dissenting, issued a memorandum decision affirming the judgment of sentence. We granted *en banc* review. Appellant now raises two issues:

1. Whether the court's sentence of Kleinicke to a sentence of five (5) years incarceration for 51 or more live marijuana plants pursuant to 18 Pa.C.S. § 7508 without unanimity of jurors as to the number of plants violated Kleinicke's sixth amendment right to trial by jury as delineated in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)?

2. Whether the [panel] correctly determined Kleinicke waived the challenge to the validity of the affidavit of probable cause premised on the confidential informant's purported statement because the claim was dependent upon material not included in the certified record when it was not included in the certified record pursuant to Pa.R.A.P. § 1921 due to

---

**2.** The guideline sentencing form in the record indicates that Appellant was sentenced to five to ten years imprisonment. However, this form is incorrect because the maximum statutory sentence in this case, as outlined above, was five years imprisonment. In addition, the sentencing transcript reflects that the court sentenced Appellant to five years imprisonment. N.T. Sentencing, 1/31/03, at 65.

an inadvertent mistake or negligence on the part of the York County Clerk of Courts in the function of their official duty.

Appellant's brief at 3.

¶ 7 We first set forth the facts necessary to review Appellant's sentencing claim. Marijuana is a Schedule I drug but is not classified as a narcotic drug. Therefore, the maximum sentence for Appellant's conviction under 35 P.S. § 780–113(a)(30) was five years imprisonment, as outlined by 35 P.S. § 780–113(f)(2).[3] Appellant's minimum sentence was impacted by 18 Pa.C.S. § 7508(a)(1)(iii), which provides in relevant part that notwithstanding any other statutory provision, if a person is convicted of 35 P.S. § 780–113(a)(30), when the controlled substance is marijuana and "when . . . the amount of marijuana involved is at least 51 live plants," the minimum sentence shall be five years in prison. Thus, based on application of 18 Pa.C.S. § 7508(a)(1)(iii), Appellant's minimum sentence converged with his maximum sentence, requiring imposition of a flat sentence of five years.[4]

¶ 8 Appellant maintains on appeal that his minimum sentence of five years imprisonment implicates the United States Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). We reject Appellant's challenge because there is a key distinction between an increase in a maximum sentence and an increase in a minimum sentence in United States Supreme Court precedent applicable to the Sixth Amendment right to a jury trial.

¶ 9 We begin with an analysis of the seminal holding of *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).[5] This case is of vast import in the sentencing area because it creates a fundamental distinction in terms of the application of the Sixth Amendment right to a jury trial between the process of conviction and the process of sentencing. *Williams*, as discussed later, retains its precedential authority with regard to this point and is vital to an analysis of the present constitutional challenge.

¶ 10 In *Williams*, the defendant was convicted of murder committed in the course of a burglary. Under applicable New York law, the jury's determination of guilt fixed the types of punishment, but the sentencing court had broad discretion to sentence within the permissible range based upon the jury's determination of guilt. In *Williams*, the sentence for murder could have been either life imprisonment or death, and while the jury recommended life imprisonment, the sentencing court imposed a death sentence. As justification, the court utilized information gleaned from a probation department report, which included accusations that the defendant had committed numerous other burglaries. Though not convicted of those crimes, the defendant had admitted committing some of the burglaries and had

---

3. That section states:
   Any person who violates clause (12), (14) or (30) of subsection (a) with respect to . . . [a]ny other controlled substance or counterfeit substance classified in Schedule I, II, or III, is guilty of a felony and upon conviction thereof shall be sentenced to imprisonment not exceeding five years, or to pay a fine not exceeding fifteen thousand dollars ($15,000), or both.

4. Normally, the practice in this Commonwealth is that the minimum sentence cannot exceed one-half of the maximum sentence. 42 Pa.C.S. § 9756(b).

5. In his dissent, Judge Bender fails to acknowledge either the *Williams* decision or the fact that it retains legal authority pursuant to language in *Blakely*.

been identified as the perpetrator of others. The report also listed other behavior by the defendant that the sentencing court characterized as demonstrating that the defendant had perverse sexual tastes and was a threat to society.

¶ 11 The defendant challenged the use of the information contained in the report on due process grounds, arguing that he had not been able to confront and cross-examine the witnesses who supplied the pertinent data. The United States Supreme Court analyzed whether due process concerns applicable during trial also controlled the manner in which a sentencing court could obtain information to guide it when imposing a sentence within the statutory range fixed by the jury verdict. It noted that under the state scheme it was reviewing, the sentencing court was permitted to consider a variety of evidence regarding the defendant's background, mental health, past conduct, and individual characteristics in fashioning a sentence.

¶ 12 The *Williams* Court chronicled the evolution of sentencing in the common law of the United States and Britain and observed that under early conventions, many criminal convictions resulted in an automatic sentence of death. Modern sentencing departed from this draconian approach and focused more humanely on individualized sentencing. Thus, under the modern rule, sentencing courts were authorized by the legislature to consider many sources and types of evidence to aid in determining the extent of punishment appropriate as long as the punishment imposed was "within limits fixed by law." *Id.* at 246, 69 S.Ct. 1079.

¶ 13 In upholding the sentence in *Williams,* the United States Supreme Court concluded that there was a historical basis for applying different rules to trial proceedings, wherein a defendant was found guilty, as opposed to sentencing proceedings, which involved considerations of an individual's characteristics in assessing the appropriate punishment. The Court ruled that individualized sentencing necessarily entailed weighing the information utilized by the sentencing court in the case before it.

¶ 14 The *Williams* Court also observed that there were practical reasons to support imposition of divergent rules for trial and for sentencing. At trial, the question is, "Whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused," while the sentencing judge is not confined to the "issue of guilt;" instead, "[h]is task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* at 247–48, 69 S.Ct. 1079 (footnote omitted).

¶ 15 The Supreme Court declared that the modern paradigm of imposing individualized sentences mandated that the sentencing court rely upon all "pertinent information," which could not be obtained if there was "rigid adherence to restrictive rules of evidence properly applicable to the trial." *Id.* at 247, 69 S.Ct. 1079. It concluded:

To deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation. We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in

open court by witnesses subject to cross-examination.

*Id.* at 249–50, 69 S.Ct. 1079.

¶ 16 *Williams* stands for the proposition that a sentencing court has broad discretion to consider evidence [6] in determining a sentence as long as that sentence is within the ceiling fixed by a jury's finding of guilt beyond a reasonable doubt at a trial, subject to all the due process guarantees contained in the United States Constitution. A distinction was thereby created between trial and sentencing for purposes of the Sixth Amendment right to a jury trial.[7]

¶ 17 Individualized sentencing, however, was not without its inequities. On occasion, there were wide disparities in sentencing based on the individual proclivities of a sentencing judge rather than the more proper considerations to be applied at sentencing such as the severity of the crime or the background of the defendant. Legislatures attempted to redress this concern by placing some limits on judicial discretion. In Pennsylvania, one attempt at such a restriction was the passage of mandatory minimum sentences.

¶ 18 We can find guidance in the mandatory-minimum area with the United States Supreme Court's pronouncement in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), which is particularly instructive as it dealt with a Pennsylvania mandatory minimum sentencing statute virtually indistinguishable from the current statute under review. Specifically, the *McMillan* Court examined the constitutionality of 42 Pa.C.S. § 9712 under the Fourteenth Amendment's due process clause, importing the Sixth Amendment's jury trial guarantee. Section 9712 requires the imposition of a mandatory minimum sentence of five years upon a defendant's conviction of one of several enumerated crimes if the sentencing court determines the defendant "visibly possessed a firearm" during the commission of the crime. The defendants in *McMillan* argued that visible possession of a firearm was an element of the crimes for which they had been sentenced and therefore had to be proven beyond a reasonable doubt.

¶ 19 The Supreme Court rejected that argument on the rationale that the Pennsylvania Legislature chose not to make visible possession of a firearm an element of the offenses listed in section 9712. In so doing, the Court noted that states have considerable latitude in "defining crimes and prescribing remedies." *Id.* at 86, 106 S.Ct. 2411. Nevertheless, the *McMillan* Court acknowledged that there are due process concerns that place constitutional limits on state authority in this context. Specifically, the Court observed that state legislatures cannot strip criminal defendants of the presumption of innocence, relieve prosecutors of the burden of proving guilt, or give trial court judges unlimited power to enhance the punishment to be imposed whenever the state obtains a conviction. After weighing these consider-

---

6. The defendant must be informed of the evidence the sentencing judge is considering so that he has an opportunity to challenge its accuracy and materiality. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1976). *Williams'* precedential value with regard to the application of the death penalty has been significantly eroded by subsequent Supreme Court rulings.

7. Judge Bender makes the rather broad statement that this distinction somehow allows the "manner in which the sentence is imposed [to be] beyond constitutional restriction." Dissent at page 585. We consider in this decision only the Sixth Amendment right to a jury trial with regard to a factor increasing a minimum sentence and not other constitutional guarantees that may apply to the sentencing process.

ations, the *McMillan* Court concluded that section 9712 was constitutional because it did not increase the statutory maximum penalty for the offense committed, create a separate crime calling for a separate penalty, or apply until a defendant had been convicted of the particular crime for which he was to be sentenced. *Id.* at 87–88, 106 S.Ct. 2411.

¶ 20 Significantly, the Supreme Court expressly disapproved of the notion that the state must prove every fact that impacts upon the "severity of punishment" beyond a reasonable doubt. *Id.* at 84, 106 S.Ct. 2411. In accordance with this view, the *McMillan* Court declined to invalidate section 9712 because "it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it …." *Id.* at 88, 106 S.Ct. 2411. Therefore, although the statute clearly " 'ups the ante' for the defendant … by raising to five years the minimum sentence which may be imposed within the statutory plan," the Court concluded that it did not violate the defendant's right to due process of law. *Id.* *See also United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (sentence provision upheld even though it increased minimum sentence if court found that defendant committed perjury). In clarifying its position on the validity of sentencing factors such as visible possession of a firearm, the Court reiterated the maxim that "there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact." *McMillan, supra* at 93, 106 S.Ct. 2411.

¶ 21 The distinction between minimum and maximum sentences is at the heart of the *Apprendi* decision. Therein, the defendant was convicted of possession of a firearm, which was classified in New Jersey as a second degree offense punishable by five to ten years imprisonment. Under a separate statute, described as the "hate crime" law, an additional term of imprisonment was imposed if the trial court found by a preponderance of the evidence that the defendant committed a crime in order to intimidate an individual or group of individuals due to race, color, gender, handicap, religion, sexual orientation, or ethnicity. The extended term permitted by the hate crime law increased the permissible range of sentences for second-degree offenses to between ten and twenty years. The trial court concluded that the defendant had committed the crime to intimidate the victim and that the offense was racially motivated. The court therefore sentenced the defendant to an increased term of imprisonment by applying the hate crime law.

¶ 22 The Supreme Court concluded that the defendant's due process rights required a jury to determine the existence of racial motivation since his maximum sentence had been increased under the hate crime law. It observed that the hate crime statute, as applied to the defendant, actually doubled the maximum range within which the sentencing judge could exercise his discretion. The *Apprendi* Court held that "any fact (other than prior conviction) that increases the **maximum** penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 476, 120 S.Ct. 2348 (emphasis added) (quoting *Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (state law increased maximum sentence based upon degree of harm suffered by victim and that finding was not made by a jury)).[8]

8. In *Almendarez–Torres v. United States,* 523     U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350

¶ 23 *Apprendi* did not announce a departure in constitutional analysis. Indeed, *Apprendi's* outcome was easily predicted by the language in *McMillan*, which, as noted, disapproved of statutes that increased maximum sentences without a jury's participation. Significantly, the Court in *Apprendi* reaffirmed the holding in *Williams*, stating that nothing in the history of the right to a jury trial would suggest that it "is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment **within the range** prescribed by statute." *Apprendi, supra* at 481, 120 S.Ct. 2348 (emphasis in original) (citing *Williams, supra* ).

¶ 24 In *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), decided merely three years ago, the Court left no doubt that *Apprendi* did not erode the holding of *McMillan*. The statute at issue in *Harris* provided for an increase in the minimum sentence if the sentencing court determined that the defendant brandished a firearm during the commission of an offense. The *Harris* Court expressly rejected a challenge to the holding of *McMillan* based on the *Apprendi* decision. Four justices reasoned that *Apprendi* did not apply because the statute under consideration in *Harris* involved an increase in a minimum sentence rather than an increase in a maximum sentence. One justice decided that *Apprendi* should not be extended to minimum sentences due to the adverse practical consequences and his conclusion that the Sixth Amendment permitted a judge to apply sentencing factors. The holding of *Harris* could not be clearer that mandatory minimum sentences that are imposed within the maximum ceiling set by the jury verdict do not violate a defendant's Sixth Amendment right to a jury trial; *Harris* cemented the key distinction between increases in minimum sentences and increases in maximum sentences.

¶ 25 The 2004 decision in *Blakely* did not implicate *McMillan* or *Harris*. A clear understanding of *Blakely* requires an analysis of how the applicable guideline scheme impacted on maximum sentences. The Washington state legislature had enacted a sentencing reform act that delineated presumptive guideline ranges setting forth maximum sentences. Under that act, a judge could impose a sentence in excess of the maximum standard range only if the judge found substantial and compelling reasons to justify an exceptional sentence. An exceptional sentence was sanctioned only when certain factors, different from those used in computing the standard range sentence, were present. The guidelines thus placed strict limitations on the discretion given to the sentencing court to operate within the maximum of a crime's statutory classification. The Supreme Court specifically observed that the sentencing reform act operated to "limit the range of sentences a judge [could] impose." *Id.* at 299, 124 S.Ct. 2531. Thus, under Washington's sentencing scheme, only when the sentencing guidelines were considered in conjunction with the crime's classification did the "legal maximum" reveal itself.

¶ 26 In *Blakely*, the defendant pleaded guilty to kidnapping his wife; in Washington, kidnapping was a felony with a maximum authorized sentence of ten years. Under the defendant's plea agreement, the

(1998), the Court rejected a constitutional challenge to a statute that increased the maximum sentence that could be imposed for a crime based upon a finding of the number of a defendant's prior convictions by the sentencing court. This holding rests upon the unique role of recidivism in the sentencing arena.

standard maximum range sentence was forty-nine to fifty-three months. At a hearing, the victim testified about the circumstances of the crime. As a result of her testimony, the judge concluded that the defendant had acted with deliberate cruelty, one of the statutorily-allowed grounds for departure in a case involving domestic violence. The judge then imposed a ninety-month maximum, over three years in excess of the maximum under the standard range.

¶ 27 The Supreme Court in *Blakely* found a violation of the defendant's Sixth Amendment right to a jury trial because the "statutory maximum" imposed was increased based on the existence of a fact, deliberate cruelty, that was not encompassed within the parameters of the defendant's guilty plea and had not been found by a jury based upon proof beyond a reasonable doubt. Even though the sentence was within the ceiling of punishment fixed by the crime's classification as a felony, the "statutory maximum" could not be determined solely by reference to the crime's felony classification due to the manner in which the guidelines operated to restrict the range of the maximum sentence.

¶ 28 *Blakely* expressly distinguished *McMillan* because *McMillan* involved an increase in a minimum sentence. The *Blakely* Court further differentiated both *McMillan* and *Williams* on the ground that "neither ... involved a sentence **greater than what state law authorized on the basis of the verdict alone.**" *Blakely, supra* at 305, 124 S.Ct. 2531 (emphasis added). By contrast, in *Blakely*, the judge's authority to sentence was increased by a fact not included within a jury verdict or guilty plea. Thus, the Supreme Court expressly reaffirmed that *McMillan* and *Williams* remain solid authority in the Sixth Amendment right to jury trial arena.[9]

¶ 29 The federal sentencing scheme at issue in *Booker* was identical to the state scheme addressed in *Blakely*. The *Booker* Court considered federal sentencing guidelines enacted by a federal sentencing statute. The guidelines were mandatory and delineated maximum ranges relating to drug possession. That particular sentencing scheme required the court to sentence a defendant to increased time based on the defendant's possession of a greater quantity of drugs than that found by the jury. Applying *Jones, Apprendi,* and *Blakely,* the Court in *Booker* concluded that application of the guidelines violated a defendant's Sixth Amendment right to be tried by a jury under the reasonable doubt standard.

¶ 30 There is nothing inherently contradictory between *McMillan/Harris* and *Blakely/Booker*. As noted, the Supreme Court consistently has observed a distinction between increasing a statutory maximum and increasing a sentence within the maximum already authorized by the jury's verdict. In every case to analyze this question, the lodestar of constitutional analysis has been application of the statutory maximum, whether the maximum is simply set forth in a statute or whether the interplay between a statute and mandatory guidelines creates the practical

9. In the face of this clear pronouncement in *Blakely* that *Williams* and *McMillan* persist as sound precedent, Judge Klein's dissent argues that the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), overruled *Williams* and *McMillan* only one year later and without any direct language to that effect. It defies logic to suggest that the United States Supreme Court would have overruled precedent *sub silentio* when it had expressly reaffirmed that precedent the previous year. Furthermore, *Booker* did nothing more than apply *Blakely*.

maximum.[10]

■ ¶ 31 Pennsylvania employs an indeterminate sentencing scheme. The sentencing judge announces a range consisting of a minimum and maximum sentence. *See* 42 Pa.C.S. § 9756 (when handing down a prison sentence, the sentencing judge must specify maximum period up to limit authorized by law and must impose minimum sentence, which cannot exceed one-half of the maximum sentence). However, the sentence that a defendant will actually serve is dependent upon whether he is granted parole by the parole board, which has the authority to do so after expiration of the minimum. Thus, the sentence that the defendant will serve cannot be determined at sentencing because while he will serve the minimum, he may serve up to the maximum or any sentence in between. Under a determinate sentencing scheme, a defendant is sentenced to a set number of years imprisonment, otherwise called a "flat" sentence. In determinate sentencing states, parole has been abolished so that the defendant will serve the sentence handed down by the sentencing judge; thus, the sentence can be determined at that time.

■ ¶ 32 Pennsylvania law makes clear that a minimum sentence serves as a guide to the earliest potential release date. *See generally Rogers v. Pennsylvania Board of Probation and Parole*, 555 Pa. 285, 289 n. 2, 724 A.2d 319, 321 n. 2 (1999) (stating that punishment imposed for criminal offense is maximum period of confinement, *i.e.*, **maximum** period of incarceration

specified by sentencing court; minimum sentence merely sets date prior to which prisoner may not be paroled); *Commonwealth v. Butler*, 458 Pa. 289, 294, 328 A.2d 851, 854–55 (1974) (holding that significance of minimum sentences arises in connection with eligibility for parole). In other words, under Pennsylvania law, the minimum sentence serves as a baseline for possible early release.[11] Thus, the Pennsylvania legislature establishes the statutory maximum possible punishment for an offense. Statutes that mandate minimum sentences serve only to limit the sentencing court's discretion regarding the manner or method of imposing the minimum sentence.

■ ¶ 33 Whether a sentencing scheme is indeterminate or determinate does not relate to the operation of sentencing guidelines. Sentencing guidelines can be advisory (voluntary) or presumptive (mandatory) or somewhere in between that broad spectrum. Under a presumptive or mandatory guideline scheme, which was at issue in *Blakely* and *Booker*, deviation is only permitted under very narrow circumstances. Under fully voluntary or advisory guidelines, the sentencing court is accorded broad discretion as to whether to consider the guidelines.

¶ 34 Pennsylvania's guidelines operate somewhere in the middle. Sentencing courts must consider the Pennsylvania guidelines. 42 Pa.C.S. 9721(b) (when imposing sentence, "court shall ... consider any guidelines for sentencing adopted by the Pennsylvania Commission on Sen-

10. As noted in *United States v. Astronomo*, 183 F.Supp.2d 158 (D.C.Mass.2001), and confirmed in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), drastic changes in the federal sentencing scheme erased *Williams's* application in the federal context.

11. Of course, the imposition of a mandatory minimum sentence is of great importance to the individual defendant and constitutes more than just an administrative guideline. For this reason, the Commonwealth's intent to pursue a mandatory minimum sentence is subject to specific notice requirements, which are not at issue in this case.

tencing."). *See also Commonwealth v. Mouzon*, 571 Pa. 419, 812 A.2d 617 (2002) (plurality) (quoting Pennsylvania House Journal 3130, September 21, 1978, in stating that guidelines were enacted "to make criminal sentences more rational and consistent, to eliminate unwarranted disparity in sentencing, and to restrict the unfettered discretion we give to sentencing judges."). However, in *Commonwealth v. Sessoms*, 516 Pa. 365, 532 A.2d 775 (1987), our Supreme Court stated that the guidelines are advisory.

¶ 35 Guideline departure in Pennsylvania is permitted under a much more relaxed standard than the one employed in Washington or the federal system evaluated in *Blakely* and *Booker*. Pursuant to 42 Pa.C.S. § 9781(c)(3), deviation is upheld if supported by reasons indicating that the deviation is not unreasonable in light of the factors a sentencing court considers pursuant to 42 Pa.C.S. § 9721(b), which include the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893 (1996); *see, e.g., Commonwealth v. Galletta*, 864 A.2d 532 (Pa.Super.2004) (sentencing court is permitted to depart from guidelines if it places on record the factual basis and specific reasons supporting decision under factors set forth in section 9721(b) of Sentencing Code). In fact, the *Booker* Court ruled that the federal guidelines could operate constitutionally as long as they, like Pennsylvania's guidelines, were voluntary in nature.

¶ 36 Moreover, what sets Pennsylvania's scheme further apart from those under consideration in *Blakely/Booker* is that Pennsylvania's sentencing guidelines delineate minimum sentencing ranges. Under the Pennsylvania guidelines, the po-

tential maximum sentence is always coextensive with the statutory maximum authorized by the jury verdict or the guilty plea.

¶ 37 At this juncture, we must stress the potential for significant adverse repercussions if any sentencing factor that increased or enhanced sentences had to be proven beyond a reasonable doubt. In Pennsylvania, when considering sentencing alternatives and terms, a sentencing court is instructed to "follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). This instruction carries a mandate that the sentencing court make relevant findings when imposing sentence. For example, a judge sentences based on whether the defendant is remorseful as well as his background and personal circumstances. A court is permitted to increase a sentence when the facts of the crime are more egregious than a typical crime of its nature and when the offense gravity score does not accurately reflect a defendant's criminal past. Thus, our longstanding precedent allows the sentencing court to consider and weigh a variety of factors when imposing a mitigated to aggravated guideline sentence and when considering whether to sentence beyond the guidelines.

¶ 38 If we held that sentencing enhancements that do not impact the maximum sentence authorized by the jury verdict fell within the ambit of *Apprendi, Blakely,* and *Booker,* serious disruption in the sentencing process would result. Each finding by a sentencing judge that "enhanced" a sentence would arguably have to be submitted to an impaneled jury and proven beyond a reasonable doubt. Sentencing proceedings

would become second jury trials. Indeed, to date, defendants have continually asserted that the various factors considered by our sentencing courts to enhance a sentence within or in excess of the guidelines must be found by a jury beyond a reasonable doubt under *Apprendi* and *Blakely*. Each panel to consider this contention has rejected it. *See, e.g., Commonwealth v. Moss,* 871 A.2d 853 (Pa.Super.2005); *Commonwealth v. Druce,* 868 A.2d 1232 (Pa.Super.2005); *Commonwealth v. Smith,* 863 A.2d 1172 (Pa.Super.2004).

¶ 39 The *Williams* decision is rooted in rational analysis of the realities of the legal system. In *Williams,* the Supreme Court sensibly recognized that the modern approach to imposing individualized sentences mandates that the sentencing court rely upon all "pertinent information," which could not be obtained if there was "rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams, supra* at 247, 69 S.Ct. 1079. *Williams* concluded that most of the information currently utilized by sentencing judges in the modern penological system would not be available with Sixth Amendment jury trial restrictions in place for every factor used to "enhance" a sentence.

¶ 40 The dissenters simply present an unworkable approach to the sentencing process. Judge Bender's approach creates the potential that a jury would have to be impaneled and the Commonwealth would have to prove beyond a reasonable doubt each factor impacting upon a sentence. Judge Klein suggests that a sentencing enhancement should be submitted to a jury under a beyond-a-reasonable-doubt standard if it results in a drastic increase in the sentence. Whether the enhance-

ment represents a drastic increase in sentence is not a workable paradigm. As far as a defendant is concerned, any increase in jail time would be drastic. *See Commonwealth v. O'Berg,* 584 Pa. 11, 880 A.2d 597 (2005) (discussing "short sentence" exception to holding in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), and concluding that it was too ambiguous to give the lower courts any guidance as to what sentence would be sufficiently short to apply the exception).

¶ 41 Mindful of all the implications of our holding today, we conclude for the following reasons that the mandatory minimum sentence imposed on Appellant did not offend *Apprendi, Blakely,* or *Booker* and did not violate Appellant's Sixth Amendment right to a jury trial. A jury convicted Appellant of manufacturing marijuana in violation of 35 P.S. § 780–113(a)(30) beyond a reasonable doubt and with all constitutional guarantees in place. The jury's verdict authorized the imposition of a maximum sentence of five years imprisonment. 35 P.S. § 780–113(f)(2). A minimum sentence of five years was mandated by 18 Pa.C.S. § 7508(a)(iii), once the sentencing court determined that Appellant possessed at least fifty-one live marijuana plants.[12]

¶ 42 The mandatory provisions set forth in section 7508 do not increase the statutory **maximum** punishment or change the grade of the crime based upon the number of plants involved. To the contrary, section 7508 regulates only the minimum sentence. Whereas this section serves to limit the court's discretion regarding the manner or method of imposing the sentence, it does not increase the maximum punishment for the conviction.

---

**12.** The jury's decision on application of the sentencing factor was merely advisory. The statute delegates the task of determining the number of plants to the sentencing judge, and thus, the duty rests with the judge and is not subject to jury resolution.

¶ 43 Since the imposition of the minimum sentence did not exceed the statutory maximum authorized by the jury's verdict, *Apprendi, Blakely,* and *Booker* were not offended, and Appellant's position to the contrary must be rejected. The ceiling of the punishment in this case was cemented by the jury's verdict, and Appellant was sentenced within the range that the jury authorized. The statute is constitutional under *McMillan* and *Harris* because it did not discard the presumption of innocence, did not create a presumption of the existence of any fact, did not place any burden of proof of the existence of any fact on Appellant, did not relieve the prosecution of its burden of proving guilt, did not alter the maximum penalty for the crime, and did not create a separate offense allowing for a separate penalty. It merely limited the sentencing court's discretion in selecting a penalty within the range already available to it.

¶ 44 Appellant's second contention concerns a suppression issue. On January 14, 2002, Appellant filed a motion to suppress, alleging that there was no probable cause to support issuance of the search warrant. Appellant apparently prepared an amended motion to suppress contending that the affidavit of probable cause contained material misstatements of fact. The amended motion had an attached exhibit consisting of a deposition purportedly of the confidential informant who supplied some of the information contained in the affidavit of probable cause. The amended motion with attached deposition is not contained in the certified record, and the lower court docket does not reflect the filing of the motion. While Appellant maintains that he filed the motion and that it was not included in the record due to a mistake on the part of the clerk of courts, he does not present this Court with a copy of the time-stamped cover sheet of the amended motion.

¶ 45 It is settled that it is Appellant's responsibility to ensure that this Court has the complete record necessary to properly review a claim. *See Commonwealth v. Whitaker,* 878 A.2d 914 (Pa.Super.2005). The docket entries in this case clearly reflect that the amended motion with attached deposition is not contained in the record, and since that motion is necessary to a review of Appellant's position that the affidavit of probable cause contained material misstatements of fact, we are unable to entertain this issue on appeal.

¶ 46 Judgment of sentence affirmed.

¶ 47 Judge KLEIN files a Dissenting Opinion in which Judge FORD ELLIOTT joins.

¶ 48 Judge BENDER files a Dissenting Opinion.

DISSENTING OPINION BY KLEIN, J.:

¶ 1 While I acknowledge that there is confusion from multiple opinions by the United States Supreme Court on the *Blakely–Booker*[13] issue, I believe that when a fact is essential to the actual punishment a defendant will receive, the determination of that fact must be made beyond a reasonable doubt by a jury. I believe that *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), which then affirmed Pennsylvania's sentencing scheme, and *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), upon which the majority rely, are no longer the law following *Booker,* although they have not been spe-

---

**13.** *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *United*

*States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

cifically overruled by the United States Supreme Court.

¶ 2 It is true that *McMillan* survived the United States Supreme Court decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Both *McMillan* and *Harris* may also be reconciled with *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). However, in my view, after *Booker*, when a fact enhances the sentence that will be imposed, that must be determined by a jury beyond a reasonable doubt. I believe this is true whether the fact determines a mandatory minimum, impacts a flat sentence (such as the Federal sentence), or determines what block in a sentencing grid will be the starting point for the minimum sentence in a sentencing scheme such as Pennsylvania's. Therefore, I am constrained to dissent.

**1. A common sense evaluation of *Booker* requires a jury to determine facts that require enhanced mandatory minimum sentences or increase the range for sentencing guidelines.**

¶ 3 I believe *Booker* provides a common sense and clearly articulated interpretation of the basic principles first announced in *Apprendi* and *Blakely*. I believe the United States Supreme Court has reached a logical conclusion based on its pronouncements in *Apprendi* and *Blakely*.

¶ 4 The United States Supreme Court has determined that when a fact will drastically impact the number of years a defendant will spend incarcerated, that fact should not be determined by a judge by a preponderance of the evidence standard but rather by a jury using "beyond a reasonable doubt" as the burden of proof.

¶ 5 Initially, the Supreme Court made the distinction based on whether or not the fact was "an element of the crime." Then it moved away from that to require a jury where the fact increased the statutory maximum. Then it moved further to say that when a fact affected the grid in the federal sentence, although not exceeding the statutory maximum, it must be determined by a jury. Since the United States Supreme Court is taking a realistic step as to whether the fact increases the amount of time a defendant is likely to spend in prison, it is only another short step to say that if the fact affects the grid position of a scheme like Pennsylvania's, that fact must be determined by the jury, whether the "guideline" is a minimum number or a "fixed" number such as in the Federal system.

¶ 6 The bottom line is that in the great majority of cases in Pennsylvania, the amount of time a defendant will be in prison is affected less by the *maximum* sentence than it is by the particular grid box in which the *minimum* sentence is determined or whether a mandatory minimum sentence is imposed. Pennsylvania imposes restrictions on a trial judge from the sentencing guidelines and the impact of mandatory minimum sentences. If a judge fails to impose a mandatory minimum sentence or sentences outside the "standard" range, and certainly outside the guidelines, unless there is something extraordinary about the facts and circumstances of the crime and/or defendant, that sentence will be reversed on appeal.

¶ 7 This is not a rare circumstance; it comes up every day in the criminal courts of the Commonwealth. Was whatever the defendant possessed something that a victim would have reasonably believed to be a firearm? How much of the drugs seized was possessed by the defendant and how much belonged to someone else? Exactly how far was the drug sale from a school yard? These are frequently contested facts.

¶ 8 The United States Supreme Court sensibly rejected the concept that jury involvement is required only when the enhancement results in a longer than statutorily allowed maximum sentence. Likewise, since the time of incarceration will generally vary greatly depending on which box in Pennsylvania's grid a case falls, it is only sensible to require facts that affect that position to be determined beyond a reasonable doubt by a jury. While in the Federal system, the flat number in the grid generally determines the amount of time a defendant will serve, in Pennsylvania, the sentencing guideline minimum generally is responsible for the date the defendant will get out of prison. Pennsylvania generally has sufficiently long maximum sentences and the time actually in custody is more determined by the minimum. Therefore, the practical effect of the United States Supreme Court cases would be negligible if we were to ignore factors that have a major impact on the sentence and the time a defendant will spend incarcerated. If the theory of *Apprendi* **and** *Blakely* is to be followed, it is necessary to have a jury decide the factual basis of mandatory minimum sentences or higher guideline minimum sentences when the facts have a major impact on the sentence. And that is what the United States Supreme Court said in *Booker*.

¶ 9 Therefore, I believe that *McMillan and Harris* have in fact been overruled by *Booker* and any fact relating to the crime that either requires a mandatory minimum or changes the standard range minimum must be determined by the jury. This view has is supported by a recent decision authored by the distinguished jurist, Judge Nancy Gertner of the United States District Court for the District of Massachusetts. In addition to being a member of the federal judiciary, Judge Gertner has taught sentencing at Yale School of Law for at least five years. She also is a Charles R. Merriam Distinguished Professor at Arizona State Law School and has taught at the law schools at Harvard, Boston College, Boston University, Northeastern University and the University of Iowa.[14]

¶ 10 Judge Gertner addressed this issue in *United States v. Malouf*, 377 F.Supp.2d 315 (D.Ma.2005). In *Malouf*, the question was whether such sentence affecting facts as drug quantity must be proven to a jury beyond a reasonable doubt. Following an exhaustive review of relevant case law, from *McMillan* through *Harris* and concluding with *Apprendi*, *Shepard*,[15] and *Booker*, Judge Gertner concluded such elements were subject to jury consideration.[16]

> In my judgment, the breadth of holding in *Booker* and *Blakely* have in fact overruled *Harris*. The Court has gone from holding that the Sixth Amendment is implicated in the determination of facts that increase a statutory maximum (*Apprendi*) to applying the Sixth Amendment to all facts "essential to the punishment" (*Booker* and *Blakely*). It has extended the application of the Sixth Amendment from statutory maximum penalties (*Apprendi*) to the mandatory "Guidelines" (*Booker*).

---

**14.** I mention these aspects of Judge Gertner's resume only to note that both professionally in the trial court and academically, she is well versed in the nuances of sentencing.

**15.** *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (questioning the "traditional sentencing factor" approach of *McMillan* and *Harris* and holding only prior convictions served as predicates for Armed Career Criminal status.)

**16.** I would adopt the reasoning found in *Malouf*. That decision is too long to be cited here and I recommend a close study of that decision.

* * * *

If the quantity figures so prominently in this important decision, it is not unreasonable to ask, as the court did of the Federal Sentencing Guidelines in *United States v. Gray*, 362 F.Supp.2d 714 (S.D.W.Va.2005)—what level of confidence should the decisionmaker have in that fact before it sentences?

*Malouf* at 326, 329.[17]

¶ 11 Initially, there seem to be three factors that allowed Pennsylvania's sentencing enhancements to escape the requirement of a jury trial and proof beyond a reasonable doubt. Two of the three have been specifically rejected by the United States Supreme Court, and a fair reading of the latest cases demonstrates that the third should fail as well.

¶ 12 A. Pennsylvania's sentencing enhancements are not "elements of the crime." That was the basis of *McMillan*. It is noted that Justice Stevens, who wrote the majority in *Booker*, said in dissent in *McMillan*, "It would demean the importance of the reasonable doubt standard—indeed, it would demean the Constitution itself—if the substance of the standard could be avoided by nothing more than a legislative declaration that prohibited conduct is not an 'element' of a crime." 477 U.S. at 102, 106 S.Ct. 2411.

¶ 13 The majority in *McMillan* was decided under a due process analysis and determined that the legislature could "up the ante" by making the visible possession of a firearm a sentencing factor rather than an element of underlying crime itself.

By determining this, the majority decision ended by noting there was no Sixth Amendment right to jury sentencing. *Id.* at 93, 106 S.Ct. 2411.

¶ 14 This view, however, was later limited by the Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Booker, supra*. In *Ring*, a death penalty case, the Supreme Court stated: "If a State makes an increase in the defendant's authorized punishment contingent upon a finding of fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring* at 602, 122 S.Ct. 2428. Further, "[t]he characterization of a fact or circumstance and an 'element' or 'sentencing factor' is not determinative of the question of 'who decides,' judge or jury." *Id.* at 605, 122 S.Ct. 2428.

¶ 15 This concept was then taken from the arena of death penalty litigation and endorsed by the majority in *Booker* as applied to the federal sentencing guidelines. When *Ring* and *Apprendi* were read together, the *Booker* court determined: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756.

¶ 16 Therefore, it seems that while "upping the ante" by the use of sentencing factors may not offend due process, it now does run afoul of the Sixth Amendment,

---

**17.** Judge Gertner also compares the *Booker/Harris* dichotomy, where *Booker* did not specifically overrules *Harris,* to the *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)/*Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) dilemma. *Brown* did not specifically overrule *Plessy,* yet there was no doubt the logic of *Brown* forbid the separate but equal doctrine in public transportation cases that followed. A lower court, in refusing to follow *Plessy,* stated: "a judicial decision, which is simply evidence of the law and not the law itself, may be so impaired by later decisions as no longer to furnish any reliable evidence." *Malouf* at 326.

unless the relevant fact is proven to a jury. Reading *McMillan, Ring* and *Booker* together, I am left with the conclusion while it may be constitutionally permissible for a legislature to enact sentencing factors that are fact dependant and are not elements of the crime, those facts are still subject to Sixth Amendment scrutiny and must be proven to a jury beyond a reasonable doubt.[18]

¶ 17 B. The enhancement does not affect the maximum, but only limits the judge's discretion for the minimum sentence. This is how the *Apprendi* Court distinguished *McMillan.* 530 U.S. at 487, 120 S.Ct. 2348, Footnote 13. In *Booker,* the dictum in a footnote in *McMillan* was rejected, as the Court rejected the government argument that since the maximum was not affected, *Apprendi* and *Blakely* do not apply. Booker's maximum sentence was not affected, but the guidelines went from 21 years, 10 months to 30 years because of "extra" drugs the trial judge found he possessed by a preponderance of the evidence. As Justices Stevens said, "The simple answer is, of course, that we were only considering a statute in that case; we expressly declined to consider the Guidelines. *See Apprendi,* 530 U.S. at 497, n. 21, 120 S.Ct. 2348. It was therefore appropriate to state the rule in that case in terms of a 'statutory maximum'

rather than answering a question not properly before the court." *Booker,* 125 S.Ct. at 752–53.

¶ 18 Further, *Booker* makes it clear that it is not speaking about statutory absolutes in sentencing. *Booker* specifically addresses guideline maximums. Guidelines are by nature a free flowing concept with room to vary a sentence. Federal guidelines are structured to address maximum sentences and so it is not surprising that Supreme Court decisions addressing the issue speak in those terms. What is fundamentally at issue, however, is the real sentence imposed upon the defendant.

¶ 19 There is undoubtedly a statutory maximum sentence for drug crimes in the federal scheme (most likely life imprisonment). None of the federal cases has determined sentencing factors were constitutionally sound because the maximum possible sentence was not affected. It therefore seems artificial to limit analysis of the Pennsylvania sentencing scheme because a sentencing factor does not extend the absolute maximum sentence.

¶ 20 Moreover, in the vast majority of cases, increasing the minimum sentence in Pennsylvania does directly affect the maximum sentence. We may take judicial notice of the fact that in an overwhelming

---

18. In many ways, the Sixth Amendment analysis of *Booker/Ring* has eviscerated the due process analysis of McMillan in announcing it makes no difference whether a fact is an element of a crime or a sentencing factor. Thus, we would be left to ponder why in a theft case a jury must decide beyond a reasonable doubt whether the value of the thing taken was $1999.00 making the crime a misdemeanor, or $2001.00 making the crime a felony—with the concurrent increase in sentencing, but a judge may decide by a fair preponderance of evidence whether a drug defendant possessed 20 live marijuana plants (a minimum one year sentence) or 21 plants, subjecting the defendant to a three year minimum sentence. Why the thief should be granted greater constitutional protection than the marijuana dealer is not immediately answerable.

I note, too, the thief, having been convicted on all relevant elements beyond a reasonable doubt, would be sentenced under the guidelines which allow a judge to deviate either higher or lower given the circumstances. However, the marijuana possessor is sentenced based upon a mere preponderance of the evidence to a mandatory minimum from which no lower deviation is allowed. Yet under the current analysis of the law, the stricter punishment is subject to lesser review.

number of cases the maximum sentence is double the minimum, not the actual statutory maximum sentence allowed. Thus, if we look at a 5 year mandatory minimum sentence for a crime with a firearm as opposed to an otherwise guideline minimum sentence of 2 years, the maximum sentence will have increased from 4 years to 10 years. Even though Pennsylvania sentencing speaks in terms of minimum sentences as opposed to the maximums, that which affects the minimum has a real and immediate effect on the maximum sentence.

¶ 21 C. Pennsylvania has an "indeterminate" sentencing system unlike the "determinate" system of the Federal Courts. This ignores the reality of the sentencing schemes in Pennsylvania and the Federal system. The "maximum" imposed in the Federal system does not fix in stone the amount of time a defendant will serve in custody, as there are various credits for "good time" and other factors. Pennsylvania focuses on the minimum sentence and requires that the minimum be no more than half the maximum.[19] That fixes the date a defendant will be eligible for parole, which often will be the release date unless the defendant acts out while in custody or there is a determination of dangerousness which could delay the parole date. However, for a vast number of defendants, the date of release is close to the minimum sentence. That is why it is the minimum that is set by the guidelines, assuming that in most cases the maximum will be twice the minimum.

¶ 22 In most of the cases, the actual time in jail will be determined by factors such as the amount of the drugs involved, whether or not something is a "firearm" because it could be reasonably assumed by the victim to be a firearm, how close the drug sale is to a school or playground, etc. Since those facts will have a major impact on the actual time in custody, it makes no sense to have a jury decide the facts only if they affect the theoretical maximum when a judge can make the decision on the minimum which much more likely will affect the actual number of months spent in custody.

¶ 23 Both the Federal and State systems are in effect "indeterminate" since at sentencing one cannot determine how long a defendant will spend in custody in either situation.

¶ 24 Can anyone dispute that Kleinicke will spend a drastically increased time in custody if he is determined to have possessed 963 marijuana plants rather than only 15? The mandatory minimum for a first offender possessing 15 plants is one year, and the normal sentence would be one to two years. However, if there are 963 plants, there is a mandatory minimum which would result in a flat five year sentence.

¶ 25 As noted, the overwhelming numbers of cases in Pennsylvania are more affected by the minimum sentence than the maximum. Therefore, if a factual determination shifts the guideline grid for the minimum so that a judge is compelled to sentence within that grid (unless there are extenuating circumstances), if the jury does not make that determination, the general effect of the *Apprendi–Blakely–Booker* cases is negligible.

¶ 26 I also comment that the "mayhem" feared by the majority if these determinations are to be made by a jury will not come to pass. Just as in a theft case, where there is a special interrogatory to

---

**19.** There is an exception if a mandatory minimum is more than one-half the statutory maximum.

determine the value of the property taken, in other situations there will be a line added to the verdict sheet as to the amount of the drugs, the distance from a playground, whether a firearm was used, etc. Also, there will always be factors specific to each case that cannot be accounted for in guidelines or mandatory enhancements, and those factors can always be used by the sentencing court to fashion an appropriate sentence within or without the guidelines. This court already sees more than its fair share of challenges to these discretionary sentencing determinations. The volume of work would be relatively unaffected.

¶ 27 Proof to a jury beyond a reasonable doubt would only apply to those factors which are specifically enumerated by the legislature or sentencing commission as enhancing a sentence or imposing a mandatory minimum sentence. These factors have been statutorily lifted from discretionary consideration by a sentencing judge and are easily distinguishable for review.

¶ 28 Therefore, in this case I would hold that the amount of plants must be determined beyond a reasonable doubt by a jury and I would remand for a new trial for a jury to decide the number of plants involved.

**2. The "hung jury" on the amount of plants requires a new trial rather than a sentence based on only 15 plants.**

¶ 29 I do not believe the defendant should be sentenced as if there were only 15 plants. The appropriate disposition is to remand the case for a new jury trial where the Commonwealth will have the opportunity to prove beyond a reasonable doubt to a new jury that more than 50 plants were involved.

¶ 30 I decline to suggest sentencing on only 15 plants for two reasons. First, because I do not believe there was an actual jury determination, but merely an advisory jury determination for the trial judge, who made the findings. Secondly, even were the jury verdict treated as binding, because the jurors did not agree, there was a hung jury and no determination at all as to whether there were more than 50 plants involved.

**A. The jury verdict as an "advisory verdict."**

¶ 31 I note there was no ultimate jury disposition as to the number of plants possessed or manufactured by Kleinicke. The trial court made the ultimate determination on this issue and the trial court's finding is what was recorded and is the basis of Kleinicke's sentence. This ultimate decision was in keeping with the state of the law as it was understood at the time of the trial.

¶ 32 Had the trial court never allowed the jury to consider the question in the first place, there would be no question that the proper disposition would be to remand for a jury determination on the number of plants involved. Because statutorily the number of plants involved was not meant to be a binding jury determination, any jury opinion as to the number of plants may be seen as irrelevant—at that time— and thus would be akin to an advisory verdict such as is found in equity or orphans' court.[20]

20. I note that advisory jury verdict is, or at least was recently, used in Florida in death penalty cases. There, the jury renders an advisory verdict on the application of the death penalty, but it is the trial judge who makes the ultimate determination. *See Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (abrogated on other grounds).

¶ 33 Because at the time it was the practice for the trial court to determine the number of plants involved, Kleinicke suffered no prejudice because the trial court allowed the jury to consider the issue. The judge made the ultimate determination.

### B. A hung jury is of no effect and there *was* no jury verdict whether or not there were more than 50 plants.

¶ 34 Of course, the trial court did allow the jury to consider the matter. Even so, the jury did not arrive at an ultimate decision. Eleven of the twelve jurors believed there were 693 plants involved. One of the jurors believed there were 15. By necessity, all agreed that there were at least 15 marijuana plants. However, that does not necessarily end the discussion because the jury was not unanimous on whether there were 693 plants.

¶ 35 As the majority pointed out, the United State Supreme Court has required that when a factual decision determines the length of a mandatory sentence, now it is up to a jury to decide those facts using a "beyond a reasonable doubt" standard. In this case, it was up to the jury to determine whether there were 51 or more plants involved. It is as if there were two charges, one for possession of 15 plants and another count of possession of 51 or more plants. At most, given the jury determination, we could say that Kleinicke had been found guilty of the lesser offense of possession of 15, but the jury hung on the question of whether he possessed 51 or more. It is as if possessing 51 or more plants was a different crime, and the number of plants was an element of that more serious crime. It is notable that the jury did not "acquit" Kleinicke of the greater charge. Had the jury reached a completely unanimous verdict on the number of plants, this discussion might not have been necessary, but the jury did not reach a complete verdict.

¶ 36 Once we view elements of sentencing equivalent to elements of the crime for due process purposes, then it would seem appropriate to treat the elements similarly for purposes of a hung jury. When a defendant is found guilty of a crime, in a multi-count indictment, but the jury cannot reach a verdict on other counts, then, in general, the Commonwealth is allowed to try the defendant again on those counts upon which the original jury could not agree.

¶ 37 This is not offensive to the constitutional prohibition against double jeopardy. For example, in *Commonwealth v. Pounds,* 281 Pa.Super. 19, 421 A.2d 1126 (1980), the defendant was found guilty of DUI and crossing the center line. The jury hung on the charge of vehicular homicide. The verdict on the lesser charges was recorded and the Commonwealth was allowed to retry Pounds on the homicide charge. Similarly, in *Commonwealth v. Kemmerer,* 526 Pa. 160, 584 A.2d 940 (1991), the defendant was acquitted of first degree murder and voluntary manslaughter, but the jury hung on second and third degree murder and involuntary manslaughter. The Commonwealth was allowed to retry Kemmerer on those charges the jury had not agreed on.

¶ 38 By analogy, if we accept the jury's consideration of the sentencing elements as binding, then the jury agreed to one of the charges but hung on the other. Thus, the Commonwealth would be allowed to retry Kleinicke on the specific factual question of whether he possessed more than 51 marijuana plants.

¶ 39 In summary, I believe that *Booker* requires a jury to determine how many plants Kleinicke possessed. Since the jury hung in this case and the judge made a

determination, it is necessary to remand this case for a new jury trial where it will be the Commonwealth's burden to prove, beyond a reasonable doubt, whether or not Kleinicke possessed more than 50 marijuana plants.

¶ 40 For these reasons, I dissent.

## DISSENTING OPINION BY BENDER, J.:

¶ 1 In a trio of decisions comprised of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the United States Supreme Court reversed a trend that had gathered tremendous momentum in the administration of criminal justice in this country. With roots in the common law of England, the traditional approach to the administration of criminal justice in the United States, and in the colonies prior to the birth of this nation, commanded that a jury return a verdict and, if that verdict was guilty, that the court impose a sentence based upon that verdict and the factual predicate underlying that verdict. Despite the lengthy tradition of trial by jury, in the half-century or so preceding the decision in *Apprendi*, it had become increasingly prevalent to remove from the jury the factfinding function as to key and material facts upon which the imposition of punishment hinged and to place it in the hands of the trial judge. Under modern sentencing schemes, the jury was still required to find the defendant guilty of the basic offense, but the actual sentence imposed might vary dramatically based upon a number of potential findings made by the trial court post-verdict.

¶ 2 For some time, it was suspected and argued that the reallocation of this factfinding function infringed upon the right to trial by jury guaranteed to all citizens in the United States Constitution. However, to the extent this argument had validity, the infringement did not end there, as increasingly this extra or post trial factfinding was conducted upon a preponderance of the evidence standard. This practice stood in derogation of the traditional burden placed upon the sovereign. Since the landmark case of *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), it has been deemed an essential application of due process that conviction rest upon proof beyond reasonable doubt. Thus, the new trend in administering criminal justice meant that the actual amount of time spent in prison was increasingly a function not of the finding of a jury tested against the beyond reasonable doubt standard, but of a finding of fact(s) made by a jurist based upon a preponderance of the evidence standard. Most likely spurred by the expediency of the approach, some might contend this legislative trend essentially steamrolled over key rights guaranteed to all citizens by the United Stated Constitution, and kept right on track until the momentum first slowed in *Apprendi*, then hit a halt in *Blakely*, and finally went into reverse in *Booker*.

¶ 3 One cannot deny that a sea change has taken place in the wake of *Blakely*. While *Apprendi* arguably acted only to reaffirm key decisions like *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), and *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), which did not impair the modern approach to sentencing, *Blakely* has been seen as going much further and has left sentencing schemes in numerous jurisdictions in shambles.[21] Indeed,

21. Appellate courts in the following states

have found at least some aspects of their

*Blakely* has led to the repeal of the Federal Sentencing Guidelines in *Booker*, thereby radically altering the way sentences are handed out in federal courts across the United States. If *Blakely* and *Booker* are seen as re-vindicating the rights of trial by jury and proof beyond reasonable doubt all across America, the Majority has decided that Pennsylvania will not join this countertrend and that criminal defendants in Pennsylvania are not entitled to the same protections afforded citizens of neighboring jurisdictions. Thus, where convicted criminals in Washington cannot have their guideline sentence enhanced for, say, acting with "deliberate cruelty" unless the question of deliberate cruelty was admitted or put to a jury and found proven beyond reasonable doubt, and where convicted criminals in the federal system will not be exposed to mandatory minimum sentences unless the qualifying factor, such as the quantity of drugs possessed, is similarly admitted or put to a jury and found proven beyond reasonable doubt, convicted criminals in Pennsylvania can be subject to mandatory minimums and sentence enhancers upon a post-trial judicial finding of fact proven by a mere preponderance of the evidence. I cannot bring myself to join this conclusion.

¶ 4 The Majority contends that the constitutional protections being revalidated all across the country are not to be enjoyed by citizens of Pennsylvania because Pennsylvania employs a system of sentencing and release from incarceration different

than many other jurisdictions in America and different from the ones under consideration in the landmark cases cited above. More specifically, the Majority contends that since Pennsylvania employs a system of indeterminate punishment, which simply means that the court imposes a range of potential incarceration—of which it has discretion in choosing—and the prisoner's actual date of release is left to the determination of the Board of Probation and Parole, *Blakely* and *Booker* are distinguishable and the principles enunciated in those cases do not relate to the mandatory minimums and enhancements found in Pennsylvania's sentencing scheme.

¶ 5 While it is true that there is a difference between Pennsylvania's sentencing scheme and those found in *Blakely* and *Booker*, the Majority fails to offer any true analysis of why this difference means that trial judges in Pennsylvania are free to impose *Booker*-like mandatory minimums and *Blakely*-like enhancements upon those appearing before them without an admission of guilt or a qualifying finding by a jury, while judges in the state of Washington and the federal courts can no longer do so. Reading between the lines of the Majority's Opinion, and taking those inferences to their logical end, the general theme that appears to underlie the Majority's distinction is essentially a "no harm, no foul" argument tied to the variability and unpredictability innate in Pennsylvania's system of sentencing and serving prison time in Pennsylvania.[22] In other

---

sentencing schemes to be violative of *Apprendi/Blakely/Booker*: New Jersey, *State v. Natale*, 184 N.J. 458, 878 A.2d 724 (2005); Indiana, *Smylie v. State*, 823 N.E.2d 679 (Ind. 2005); Minnesota, *State v. Shattuck*, 689 N.W.2d 785 (Minn.2004); Oregon, *State v. Dilts*, 337 Or. 645, 103 P.3d 95 (2004); Washington, *State v. Hughes*, 154 Wash.2d 118, 110 P.3d 192 (2005); Colorado, *Lopez v. People*, 113 P.3d 713 (Colo.2005); and North Carolina, *State v. Allen*, 359 N.C. 425, 615 S.E.2d

256 (2005). Additionally, the state of Kansas modified their sentencing schemes in the wake of *Apprendi*. Kan. Stat. Ann. § 21–4718(b)(2).

**22.** This variability and/or unpredictability has two facets. One facet is the imposition of sentence, which in Pennsylvania has greater variability than many other jurisdictions due to the amount of discretion vested in the trial court. The other facet is release from prison,

words, the Majority seems to be contending that because a convicted criminal just might have received from the court in the exercise of its discretion the very same sentence the mandatory minimum dictated or the sentencing enhancement produced, or just might have been made to serve that much time by the parole board, if indeed given that sentence by the court, then the constitutional protections at issue can be obviated.

¶ 6 In actuality, the Majority's premise had legal support, right up to the issuance of *Blakely* and *Booker*. Beyond then, however, the issue is hardly as simple as the Majority portrays it. Encompassed in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the 1949 sentencing decision upon which the Majority builds its thesis, and sentencing cases that would follow, is an approach to sentencing one might term as laissez-faire. The approach is grounded in the essential due process notion of notice and the expedient premise that the citizenry and prospective criminal is placed on notice of what punishment awaits him for engaging in a proscribed activity. If one were to summarize this approach, it might read like this: as long as the sentence imposed was within the range authorized by statute for the crime committed, the manner in which the sentence was imposed was immaterial and did not offend either the right to jury trial nor due process/proof beyond reasonable doubt. The rationale for the approach might be summarized as this: since a convicted individual was considered on notice that he could receive up to the statutorily authorized punishment for the crime committed, and since the state could legally sentence the convicted individual to the statutorily authorized

maximum, as long as the sentence does not exceed that statutorily authorized maximum, the manner in which the sentence is imposed is beyond constitutional restriction.

¶ 7 The above approach is aptly exemplified by the words of Justice Scalia in his Concurrence to *Apprendi*:

I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is exposing himself to a jail sentence of 30 years—and that if, upon conviction, he gets anything less than that he may thank the mercy of a tenderhearted judge (just as he may thank the mercy of a tenderhearted parole commission if he is let out inordinately early, or the mercy of a tenderhearted governor if his sentence is commuted). Will there be disparities? Of course. But the criminal will never get *more* punishment than he bargained for when he did the crime, and his guilt of the crime (and hence the length of the sentence to which he is exposed) will be determined *beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*

*Apprendi*, 530 U.S. at 498, 120 S.Ct. at 2367.

¶ 8 That the above approach and rationale underlay the sentencing decisions pre-*Apprendi/Blakely* is evidenced by the following passage from *Harris*, where the Court capsulized its earlier holding in *McMillan*:

The sentencing factor in *McMillan* did not increase "the penalty for a crime beyond the prescribed statutory maximum," 530 U.S. at 490[, 120 S.Ct. 2348]; nor did it, as the concurring opinions in

which is variable because a prisoner's ultimate release date is entrusted to the Board of Probation and Parole and because a prisoner in Pennsylvania has no right to release upon

expiration of the minimum sentence and could, theoretically, be imprisoned until expiration of the maximum sentence imposed at sentencing.

*Jones* put it, "alter the congressionally prescribed range of penalties to which a criminal defendant is exposed," 526 U.S. at 253[, 119 S.Ct. 1215] (SCALIA, J., concurring). As the *Apprendi* Court observed, the *McMillan* finding merely required the judge to impose "a specific sentence *within the range* authorized by the jury's finding that the defendant [was] guilty."

. . .

Whether chosen by the judge or the legislature, the facts guiding judicial discretion below the statutory maximum need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt. When a judge sentences the defendant to a mandatory minimum, no less than when the judge chooses a sentence within the range, the grand and petit juries already have found all the facts necessary to authorize the Government to impose the sentence. The judge may impose the minimum, the maximum, or any other sentence within the range without seeking further authorization from those juries—and without contradicting *Apprendi.*

*Harris,* 536 U.S. at 563–65, 122 S.Ct. at 2417–18. Stated more succinctly, *McMillan* defended Pennsylvania's mandatory minimum statutory provision by reasoning that the effect of the provision was merely to limit the exercise of the court's discretion within a statutorily authorized range and since the punishment inflicted was within the range set forth by statute, the defendant had no right to complain that absent the mandatory minimum, he might have gotten a lesser sentence.

¶ 9 The above rationale was the glue that allowed all of the various sentencing decisions to adhere to one another in convincing fashion. As the Majority observes,

*Apprendi* did not invalidate the above approach because the enhancement involved in *Apprendi* took the sentence outside the range specifically authorized by the New Jersey statute for the crime in question, a second degree offense, and moved it into a class equal to a first degree offense. *Apprendi,* 530 U.S. at 491, 120 S.Ct. at 2363. As such, it clearly violated the principle enunciated in the earlier decisions. That is, New Jersey was not prevented from punishing a convicted defendant more severely if it was concluded the defendant had acted with a biased purpose, it merely meant that to punish the defendant more severely the issue was subject to the right to jury trial.

¶ 10 However, the glue of the above rationale began to dissolve in *Blakely,* as the sentence imposed upon Blakely **after** the court-added enhancement was still safely within the limits authorized by statute. Unlike *Apprendi,* who received a sentence beyond that which he could be deemed to have been on notice, Blakely's sentence was well below the statutorily authorized maximum and was, therefore, within the range Blakely was deemed to have been duly warned his criminal behavior could bring as punishment. If it was indeed true that "whether chosen by the judge or the legislature, the facts guiding judicial discretion below the statutory maximum need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt," as the Court had stated in *Harris* just a few years earlier, why did the fact that the court had decided that Blakely had acted with deliberate cruelty, rather than a jury, violate the 6th Amendment when an enhanced sentence was imposed on the basis of that finding? I would respectfully submit that nothing within the Majority's Opinion satisfactorily answers this question.

¶ 11 If I may be allowed to posit an explanation, the most intellectually satisfying answer is that by the time of *Blakely* the Court had backed away from its prior stance and was now unwilling to allow the constitutional analysis to be guided by a wholly abstract or theoretical possibility and instead looked at the real life consequences of judicial factfinding. In *Blakely*, although the Washington crimes code authorized a sentence of up to 10 year's confinement, this number was a mere statutory ceiling, possibly reserved for the most egregious crime in the classification or the most egregious example of the crime in question. Most sentences actually imposed fell below this ceiling, and in Blakely's case other applicable sentencing provisions delineated a presumptive sentence of 49 to 53 months imprisonment. Because of these provisions, the application of the sentencing enhancement meant, as the term enhancement implies, that for all intents and purposes Blakely would be spending an additional 37 months in prison as a result of a judicial finding of fact as opposed to a jury's finding of fact.

¶ 12 Of course, the *Blakely* Court did not express an opinion that tying additional punishment to the factor in question would pose a constitutional dilemma and I doubt anyone would contend that attaching additional punishment to the factor of deliberate cruelty violated a constitutional protection. However, because the enhancement was added upon the court's finding of fact, as opposed to a jury's, the enhancement was deemed in violation of Blakely's right to trial by jury. Or, to state the above in terms of another constitutional viewpoint, since an appreciable amount of Blakely's prospective prison time was directly tied to a factual finding, that factual finding constituted an "element" for purposes of constitutional analysis and was not merely a "sentencing factor."

¶ 13 The same observation/analysis applies to Freddie Booker, who, under federal statute, was subject to imprisonment for life after having been found guilty, by a jury, of possessing at least 50 grams of cocaine base. Despite the fact that a life sentence was statutorily authorized by the jury's verdict, under the federal sentencing guidelines the quantity of drugs Booker was found to have possessed, ostensibly 92.5 grams, and Booker's criminal history called for a theoretically less-severe sentence between 210 and 262 months in prison. However, at a sentencing hearing subject to a preponderance of the evidence burden of proof, the court heard evidence that had not been presented to the jury, evidence that Booker possessed 566 grams of "crack" in addition to the 92.5 grams the jury was told about. Based upon this finding, the sentencing guidelines provided a range of punishment between 360 months and life imprisonment. Again, since the jury's verdict authorized a sentence of up to life imprisonment, the provision in *Harris* that "whether chosen by the judge or the legislature, the facts guiding judicial discretion below the statutory maximum need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt" would have compelled the conclusion that Booker's constitutional rights were not violated by the imposition of a 360 month sentence. Nevertheless, not only did the *Booker* Court conclude that the sentence in excess of 262 months violated Booker's constitutional rights, the Court also concluded that the entire approach to sentencing encompassed in the federal sentencing guidelines was constitutionally infirm.

¶ 14 The rationale underlying *Blakely* and *Booker* seems undeniable, a system of sentencing that attributes a significant portion of a criminal defendant's punishment to a finding of fact made by a judge

upon a preponderance of the evidence standard as opposed to a finding by jury utilizing a beyond reasonable doubt standard is in derogation of a defendant's right to trial by jury and violates due process even if the sentence ultimately imposed falls under the statutorily authorized limit for the crime in question. *Blakely* clearly shifted the focus away from what the sovereign was legally authorized to impose and directed it toward the real-life consequences of judicial factfinding within the sentencing scheme in question. As the Court stated in *Blakely:*

> Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts *require* a sentence enhancement or merely *allow* it, the verdict alone does not authorize the sentence.

*Blakely,* 542 U.S. at 305 n. 8, 124 S.Ct. at 2538 n. 8.

¶ 15 Returning to the Majority's distinction and the presumptive rationale underlying that distinction, do the mandatory minimum and enhancement factors found in Pennsylvania's sentencing scheme have the same practical effect as those under consideration in *Blakely* and *Booker?* I believe the answer is yes. I believe that, despite the fact that the time a prisoner may ultimately spend in jail is less definite in Pennsylvania than under the sentencing schemes at issue in *Blakely* and *Booker,* it is undeniable that a correlation exists between the minimum sentence imposed and the time the average prisoner spends in jail. Therefore, when a prisoner's minimum sentence is increased by operation of enhancements or mandatory minimum sentences, or the range of imprisonment is increased by these provisions, his time in prison will be increased as well.

¶ 16 With respect to the ultimate release from prison, the Majority is correct when pointing out that a prisoner in Pennsylvania cannot know precisely when he will be released from prison, as the prisoner's release is determined by the parole board. Nevertheless, a prisoner in Pennsylvania will know when he will be eligible for parole. In Pennsylvania, a prisoner is eligible for parole upon serving the minimum sentence imposed by the trial court. Recent data indicates that parole requests are granted approximately 60% of the time,[23] and a recent study by Allegheny County of prisoners from that county released from Department of Corrections facilities in 2002 showed that those prisoners served, on average, 75% of their maximum sentence.[24] As such, it is clear that the typical prisoner is released before the expiration of his maximum term. Thus, on average, a sentencing provision which has the practical effect of increasing the range of imprisonment imposed will result in a greater time served for the prisoner.

¶ 17 Additionally, the maximum sentence is not automatically coterminous with the statutory maximum. Rather, the maximum sentence is imposed by the trial court in the exercise of the court's discretion in conjunction with the sentencing guidelines. The parole board is not authorized to keep a prisoner beyond the maximum sentence imposed by the court, even if that maximum falls under the maximum allowed by law. Thus, while the

---

23. 2005 Annual Report, Pennsylvania Board of Probation and Parole. *http:// www.pbpp.state.pa. us/pbppinfo/lib/pbppinfo/pdfpubs/PBPP2005 Annual rpt.pdf.*

24. *http://www.county.al legheny.pa.us/dhs/Jail-Init/OffReentryP1.pdf*

parole board retains the power to determine the actual release date, that power is limited by the upper range set by the court in the exercise of its discretion. This necessitates a look at the mechanism for imposition of a sentence range in Pennsylvania and past sentencing practice.

¶ 18 With respect to the sentencing court's setting of a range of imprisonment, while trial courts have the theoretical freedom to impose a minimum sentence up to one-half of the statutorily authorized limits,[25] the truth of the matter is that our law does constrain the exercise of discretion in a fashion not markedly different than the statutes/schemes found in *Blakely* and *Booker.*

¶ 19 In Pennsylvania, 42 Pa.C.S. § 9721 provides:

> **b) GENERAL STANDARDS.**—In selecting from the alternatives set forth in subsection (a) the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing adopted by the Pennsylvania Commission on Sentencing

and taking effect pursuant to section 2155 (relating to publication of guidelines for sentencing).

With respect to sentencing guidelines, the sentencing court is obligated to consider the guidelines. While departure is allowed, statutory law requires the court to explain its reasoning for departing from the guidelines on the record.[26] Moreover, our caselaw makes clear that a departure should not be based merely upon the sentencing court's opinion that the guideline range provides insufficient punishment, but rather, departure should be based upon the conclusion that the conduct underlying the crime in question differed from the conduct typically associated with that crime so as to render the suggested punishment inappropriate for the particularized facts of the case. *See Commonwealth v. Walls,* 846 A.2d 152 (Pa.Super.2004); *Commonwealth v. Gause,* 442 Pa.Super. 329, 659 A.2d 1014 (1995). Lastly, in cases where a sentence is imposed that falls outside the guidelines—both above and below—numerous cases prove that where, after extending due deference to the sentencing court, the reasons offered for the departure do not appear reasonable to this Court, the sentence will be vacated and the case remanded for resentencing. *See Walls,* 846 A.2d at 157.[27]

**25.** 42 Pa.C.S. § 9756(b) provides that in imposing a sentence of total confinement, the court must set forth a minimum and a maximum term of imprisonment. While the maximum term of imprisonment a judge may impose is limited by the statutory ceiling, the court must impose a minimum term of imprisonment that is no more than half of the maximum sentence imposed.

**26.** "In every case where the court imposes a sentence outside the sentencing guidelines adopted by the Pennsylvania Commission on Sentencing pursuant to section 2154 (relating to adoption of guidelines for sentencing) and made effective pursuant to section 2155, the court shall provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines. Failure to comply shall be grounds for vacating the sentence and resentencing the defendant." 42 Pa.C.S. § 9721.

**27.** It is also notable that, although theoretically a judge in Pennsylvania could disregard the guideline suggestions and impose a sentence coterminous with the statutory maximum, statistically speaking this has not been the experience in Pennsylvania. According to the 1999 Annual Data Report issued by The Pennsylvania Commission on Sentencing, 72.5% of all sentences imposed were within the standard range and 8.9% of sentences were in the aggravated range. Only 5.1% of all sentences

¶ 20 Consequently, although perhaps allowing for greater flexibility than those sentencing schemes considered in *Blakely* and *Booker*, Pennsylvania's sentencing scheme has presumptive starting points and constraints on the imposition of sentence just like the schemes under consideration in *Blakely* and *Booker*.[28] The conjunction of past experience in sentencing by Pennsylvania judges with the parole

were above the guideline ranges. Sentencing in Pennsylvania 1999: 1999 Annual Data Report, The Pennsylvania Commission on Sentencing.

**28.** The idea that the Washington sentencing scheme provides little room for departure from the guidelines is not borne out by the relevant statutory language of the Washington Revised Code §§ 9.94A.120 and 9.94A.390, which were the provisions in effect at the time Blakely was sentenced. Those sections follow:

§ 9.94A.120. **Sentences**

When a person is convicted of a felony, the court shall impose punishment as provided in this section.

(1) Except as authorized in subsections (2), (4), (5), (6), and (8) of this section, the court shall impose a sentence within the sentence range for the offense.

(2) The court may impose a sentence outside the standard sentence range for that offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence.

(3) Whenever a sentence outside the standard range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law. A sentence outside the standard range shall be a determinate sentence.

§ 9.94A.390. **Departures from the guidelines**

If the sentencing court finds that an exceptional sentence outside the standard range should be imposed in accordance with RCW 9.94A.120(2), the sentence is subject to review only as provided for in RCW 9.94A.210(4).

The following are illustrative factors which the court may consider in the exercise of its discretion to impose an exceptional sentence. The following are illustrative only and are not intended to be exclusive reasons for exceptional sentences.

(factors omitted). *State v. Branch*, 129 Wash.2d 635, 919 P.2d 1228 (1996), is one example where the sentencing court departed from the guidelines. There an exceptional sentence 16 times the maximum of the "standard" sentencing range was upheld.

Similar provisions can be found in the United States Code, which reads:

Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

18 U.S.C. § 3553. If one reads the statutory factors to be considered in imposing sentence, one will see a substantial similarity to the concepts embodied in our own sentencing law.

(a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

*Id.*

practices of the State Board of Probation and Parole indicates that, while theoretically a defendant could be sentenced to the statutory maximum and could serve the entire sentence, the average defendant can expect to receive a minimum sentence within the standard range of the guidelines, or possibly in the aggravated range, and be paroled sometime after reaching eligibility and well before serving the maximum sentence. Therefore, those portions of Pennsylvania's sentencing scheme that dictate the application of enhancements or mandatory minimums based upon judicial factfinding clearly have the effect of increasing a prisoner's stay in jail based upon those judicially found facts extraneous to the verdict, the same as in *Blakely* and *Booker*.[29] The present case provides an apt illustration of how mandatory minimums and/or sentencing enhancements lead to greater time spent in jail upon judicial factfinding.

¶ 21 Appellant was convicted of one count of manufacturing marijuana, which is prohibited at 35 P.S. § 780–113. Various subsections of 35 P.S. § 780–113, set forth the various gradings and maximum punishment for violations of the act. The subsection applicable to Appellant provides:

Any person who violates clause (12), (14) or (30) of subsection (a) with respect to:

. . .

(2) Any other controlled substance or counterfeit substance classified in Schedule I, II, or III, is guilty of a felony and upon conviction thereof shall be sentenced to imprisonment not exceeding five years, or to pay a fine not exceeding fifteen thousand dollars ($ 15,000), or both.

35 P.S. § 780–113(f). Thus, the offense Appellant was convicted of violating was punishable by imprisonment not exceeding five years.

¶ 22 However, as indicated earlier, barring the application of a mandatory minimum sentence necessitating a different result, the court must set forth a minimum and a maximum term of imprisonment. While the maximum term of imprisonment a judge may impose is limited by the statutory ceiling, the court must impose a minimum term of imprisonment that is no more than half of the maximum sentence imposed. 42 Pa.C.S. § 9756(b). This provision, in effect, creates a ceiling for the minimum sentence as well. Thus, in light of the statutory maximums implicated here, the greatest minimum sentence the court could legally impose would be 30 months' imprisonment and the greatest minimum/maximum range would be 30 to 60 months' imprisonment.[30] Based upon

**29.** Logically speaking, a sentence enhancement necessarily increases a sentence because once the qualifying fact is found, the enhancement is added to the guideline ranges, youth/school enhancement, 204 Pa.Code § 303.9(c), or a new guideline matrix is implicated, deadly weapon enhancement, 204 Pa.Code § 303.10. Similarly, it cannot be doubted that a mandatory minimum is designed to increase the punishment that would otherwise normally attach by removing the possibility that a lesser sentence would be imposed. If sentences greater than the mandatory minimum amount were routinely imposed, there would be no need for the mandatory minimums. Moreover, a reference to the guide-

lines with respect to aggravated assault based upon an attempt to cause serious bodily injury demonstrates a typical increase in punishment. Aggravated assault-attempt serious bodily injury has a guideline range of 22–36 months' imprisonment. However, if the mandatory minimum provisions of 42 Pa.C.S. § 9712 are implicated by committing the crime with a handgun, then the guidelines are overridden and the mandatory minimum of 60 months must be applied.

**30.** In all likelihood, because drug offenses are subject to the mandatory minimum provisions of 18 Pa.C.S. § 7508, there is no readily discernible guideline recommendation for the

the above statistical data, we can presume that had the sentencing court imposed the highest range allowed by law, 30 to 60 months, Appellant would have been released sometime between his 30th and 60th month.

¶ 23 In contrast, application of the mandatory minimum sentence provision in Appellant's case means that Appellant will spend all 60 months in jail. Thus, barring the almost completely unforeseeable circumstance that Appellant would have been both sentenced to the statutory maximum and denied parole for the entire length of his stay in prison had he been given a non-mandatory sentence, Appellant will spend more time in jail as a result of a judicial finding of fact based upon a preponderance of the evidence standard. Certainly the average defendant exposed to mandatory minimums will spend increased periods of time in prison due to the application of mandatory minimum sentences. The exact amount of time may not be subject to precise calculation, but it is nonetheless a real and substantial period of time, particularly to the individual sentenced, who will have to spend that time in the state correctional system. In this respect, I fail to see how this very remote possibility that Appellant would have served the same sentence in the absence of the mandatory minimum invalidates the basic premise of *Blakely* and *Booker*.

¶ 24 Of course, there is nothing constitutionally infirm about tying greater punishment to the quantities of contraband possessed. However, since additional quantities are having the practical consequence of increasing the defendant's time in jail, under *Blakely* and *Booker* the quantity of drugs can now be deemed to be

an element of the crime that must be found by a jury and proven beyond reasonable doubt. In the present case, not only was the key finding, that Appellant possessed at least 51 live plants, made by the court upon a preponderance of the evidence standard, it was done in spite of the jury's inability to unanimously agree as to this specific fact. The right to trial by jury was designed to protect against exactly this kind of jury nullification.

¶ 25 Lastly, as the Majority sees fit to point out the adverse repercussions to a contrary finding, I feel equally compelled to point out the potential repercussions of the Majority's holding today. Let me first state that "adverse repercussions" does not constitute a legitimate basis for overriding a constitutional protection. Justice O'Connor made the same argument in *Blakely*, referencing "disastrous" practical consequences, 542 U.S. at 314, 124 S.Ct. at 2544, yet the argument was not seen by the Majority as a legitimate basis for eviscerating a constitutional protection. Why would such an argument carry little weight? Because "significant adverse repercussions" essentially bespeak a factor to be weighed in setting policy and constitutional protections trump such weighing of expediency. Indeed, the repercussion to the Court's conclusion in *Booker* was the invalidation and rejection of the mandatory guideline sentencing provisions which were at the heart of the federal sentencing scheme. One could argue that the sentencing scheme in federal courts was thrown into chaos as a result of *Booker*. Nevertheless, this predictable consequence was not seen as a basis for avoiding the result dictated by a reasonable application of the constitution. Similarly,

---

manufacture of marijuana plants. The most closely corresponding guideline range would be possession with intent to deliver marijuana, 1 to 10 pounds. This category has an

offense gravity score of 5 and the guideline range is restorative sanctions to 9 months in prison where the prior record score is 0.

virtually all landmark cases have come with repercussions. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), meant that the various States and the federal government must supply an indigent defendant with counsel, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), meant that police officers would be required to provide warnings prior to interrogating prisoners, and *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), meant that cities would incur the costs of integrating schools.

¶ 26 The above notwithstanding, I feel obligated to point out the potential repercussions which could result from the Majority's analysis. The Majority provides, via its holding, a model whereby the constitutional rights to trial by jury and proof of guilt beyond reasonable doubt can be eviscerated to the point where they are rendered meaningless. Applying the holding of the Majority, the legislature could, if it were so inclined, rewrite the Crimes Code in such a manner as to substantially reduce the number of official crimes in the Crimes Code, while simultaneously enacting a vast array of "sentencing factors." In this model, the legislature could create general offenses while taking what have been understood since common law days to be elements of crimes—and could also include the many statutory proliferations since—and retitle these elements "sentencing factors." Of course, these sentencing factors would be within the province of the trial judge and the burden placed upon the Commonwealth with respect to proving a sentencing factor would be by a preponderance of the evidence.

¶ 27 For instance, all offenses involving a physical affront to the person could be classified as "assault" and be defined as the touching of another without license or valid consent which produces pain, bodily injury, embarrassment or mental anguish to the person touched or was committed with the intent of receiving sexual gratification. Assault could be punishable by imprisonment up to life. Within the classification of assault one could find numerous sentencing enhancements and/or mandatory minimum sentences which mirror current offenses. Under this new model, there would no longer be an offense of rape, sexual assault or indecent contact. These traditional crimes would simply be "assaults." Once a jury returned a verdict of guilty of assault, reflecting a finding that there was a non-consensual touching or an invalid consensual touching that caused pain, bodily injury, embarrassment or mental anguish in the victim or was performed with the intent of providing sexual gratification to the toucher, a "sentencing hearing" would take place in which a judge would determine, upon a preponderance of the evidence, if sentencing enhancement factors were present. First, the court might determine whether a sexual or intimate part of the body was touched. Next the court might determine whether there had been penetration of a type necessary for the former crime of rape, and if so, whether the person touched was incapable of consenting due to (a) mental disability or (b) insufficient age, or whether the touching resulted from (c) threat of forcible compulsion or (d) forcible compulsion. Each one of the above "sentencing factors" would then trigger either a sentencing enhancement to be added to a base sentence or a mandatory minimum sentence.

¶ 28 Since prosecutors have often found it challenging to prove that intercourse occurred as a result of threat of forcible compulsion that would prevent the resistance of a reasonable person, a prosecutor might feel relief in having to prove this sentencing factor by a mere preponderance of the evidence and might welcome

needing to convince only the court and not twelve citizens who sometimes bring certain prejudices to the jury box with them.

¶ 29 Similarly challenging, at least on an academic level, is proving intent. Whether it is intent to inflict serious bodily injury, which has proven problematic in aggravated assault cases, or intent to kill, similarly problematic in homicide or attempted homicide cases, under the new model, intent can be relegated to the classification of "sentencing factor" which might trigger a mandatory minimum sentence much greater than the standard sentence for a "simple" assault.

¶ 30 The offense of aggravated assault-DUI and Homicide by Vehicle–DUI could be eliminated and simply replaced with a new DUI law. In this new model, once a jury found the minimal level of impairment necessary to satisfy the statutory elements, the court would take over and find any number of possible enhancement factors. The degree of intoxication might be a sentencing factor as well as whether anyone was endangered by the act, harmed by the act or killed by the act. In this model, causation could also be relegated to the realm of sentencing factor.

¶ 31 Under the new model, the court would impose a minimum sentence consistent with the myriad post-trial fact finding of sentencing factors. For simplicity, the maximum sentence would by default be the maximum allowed by law and, as now, a prisoner would be subject to parole upon the expiration of his "minimum" sentence. Actually, one does not need to strain his/her imagination too much to envision such a system as the combination of the United States Crimes Code and the Federal Sentencing Guidelines provided a system far along this path with the notable difference being that sentences under the federal system are determinate and prisoner's are not paroled.[31] In the Majority's eyes, since the court would be imposing only a minimum date of incarceration and the actual date of release would be set by the parole board, this new model would pass constitutional muster.

¶ 32 If the Pennsylvania legislature, spurred by the Majority's holding, were to institute a system of administering criminal justice similar to the one described above, would the Majority still contend that this simple distinction would make constitutional a system which so severely depreciated the right to trial by jury and proof beyond reasonable doubt? Would such a model violate the holdings of *Blakely* and *Booker*? If the answer to this question is "yes," then I believe the Majority has reached the wrong conclusion in

**31.** For example, in *United States v. Cole*, 359 F.3d 420 (6th Cir.2004), the two defendants pled guilty to the offenses of kidnapping, assault, and the use of a firearm during a crime of violence. Under the United States Sentencing Guidelines, a lengthy list of potential "offense characteristics," *i.e.* sentencing factors, were applicable to the offense of kidnapping, abduction or unlawful restraint. *See Cole,* 359 F.3d at 423 n. 2, for a list of offense characteristics. However, because the charges stemmed from an incident involving sexual assault, the guidelines directed the court to utilize another set of guidelines if the result was a greater offense level. Similar to the offense of kidnapping the "offense charac-

teristics" for "Criminal Sexual Abuse" required the court to consider a large number of potential factors which could affect the ultimate sentence imposed. *Id.*, at n. 3.

Thus, although the court was sentencing on a kidnapping charge, specific judicial findings were made with respect to sexual abuse/assault, a crime to which Cole did not plead guilty. These judicial findings had a direct bearing on the sentence Cole received, but were not found by a jury or, apparently, specifically acknowledged in a guilty plea proceeding. Rather, they were found by the court at the conclusion of a sentencing hearing.

the present case. Since I believe the correct answer is "yes," I dissent.