J-A21019-15

2015 PA Super 187

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| --- | --- |
| Appellee | |
| v. | |
| QU'EED BATTS | |
| Appellant | No. 1764 EDA 2014 |

Appeal from the Judgment of Sentence May 2, 2014
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0001215-2006

BEFORE: ALLEN, J., MUNDY, J., and FITZGERALD, J.[*]

CONCURRING AND DISSENTING OPINION BY FITZGERALD, J.:

**FILED SEPTEMBER 04, 2015**

The Majority Opinion thoroughly summarizes the factual and procedural history of the instant appeal, as well as the legal framework established by **Miller** and the prior Pennsylvania Supreme Court decision in this matter.[1] Majority Slip Op. at 1-14. I concur that **Miller** must be applied narrowly as a rejection of the mandatory imposition of a juvenile life-without-parole sentence. **See id.** at 8-9 (discussing **Batts II**, 66 A.3d at 295-96). I also agree the current law does not support Appellant's suggestion that we import the standards and procedures for the imposition

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See Miller v. Alabama**, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 47 (2012); **Commonwealth v. Batts**, 620 Pa. 115, 66 A.3d 286 (2013) ("**Batts II**").

of the death penalty to juvenile life-without-parole sentences. ***See id.*** at 21-24 (discussing 42 Pa.C.S. § 9711 and Appellant's Brief at 89, 93). However, following a review of Pennsylvania's sentencing law, I believe waiver under Pa.R.A.P. 2119(f) is not appropriate and would hold the trial court failed to consider properly the unique issues raised when imposing a sentence of life-without-parole. Thus, for the reasons that follow, I would remand this matter for resentencing.

It is undisputed that ***Miller*** held "***mandatory*** life-without-parole sentences for juveniles violate the Eighth Amendment." ***Miller***, ___ U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 19 (emphasis added). In focusing on the mandatory nature of sentencing, Justice Kagan's lead opinion in ***Miller*** concluded: "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." ***Id.*** at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 35. ***Miller*** declined to consider whether the Eighth Amendment categorically barred juvenile life-without-parole sentences. ***See id.***at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 35-36; ***Batts II***, 620 Pa. at 123, 66 A.3d at 291.

Nonetheless, the lead opinion in ***Miller*** stated:

> [W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty . . . of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the ***rare*** juvenile offender whose crime

reflects irreparable corruption. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Miller*, ___ U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 36 (citations, quotation marks, and footnote omitted) (emphasis added).

While *Miller* must be applied narrowly, *see Batts*, 620 Pa. at 131-32, 66 A.3d at 296, the United States Supreme Court set forth two guiding principles: first, "children are constitutionally different from adults for purposes of sentencing[;]" and second, "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." *See Miller*, ___ U.S. at ___, 132 S. Ct. at 2464-65, 183 L. Ed. 2d at 20, 24-25. Those polestars reflected the following penological considerations:

First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

*Id.* ___ U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 20-21 (citations and footnote omitted). Moreover,

["]'[o]nly a relatively small proportion of adolescents'" who engage in illegal activity "'develop entrenched patterns of

- 3 -

problem behavior.'" . . . ["D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." [T]hose findings—of transient rashness, proclivity for risk, and inability to assess consequences— both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.'"

*Id.* at ___, 132 S. Ct. at 2464-65, 183 L. Ed. 2d at 21-22 (citations omitted).

The *Miller* Court summarized:

[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because "'[t]he heart of the retribution rationale'" relates to an offender's blameworthiness, "'the case for retribution is not as strong with a minor as with an adult.'" Nor can deterrence do the work in this context, because "'the same characteristics that render juveniles less culpable than adults'"—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. Similarly, incapacitation could not support the life-without-parole sentence . . . . Deciding that a "juvenile offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"—but "'incorrigibility is inconsistent with youth.'" And for the same reason, rehabilitation could not justify that sentence. Life without parole "forswears altogether the rehabilitative ideal." It reflects "an irrevocable judgment about [an offender's] value and place in society," at odds with a child's capacity for change.

*Id.* at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 23-24 (citations omitted).

Following *Miller*, the Pennsylvania Supreme Court remanded this matter for resentencing and directed the trial court, *inter alia*, to consider age-related factors. *See Batts II*, 620 Pa. at 133, 66 A.3d at 297 (citing

- 4 -

*Commonwealth v. Knox*, 50 A.3d 732, 745 (Pa. Super. 2012)). However, the *Batts II* decision did not provide guidance on how to consider age-related factors. *Id.* at 296-97. In my view, the answer lies in the traditional sentencing principles in Pennsylvania and an evaluation of the effects of *Miller*.

Traditionally, sentencing for murder of the first degree represented an exception to Pennsylvania's "indeterminate, advisory, and guided" sentencing scheme. *See Commonwealth v. Yuhasz*, 592 Pa. at 120, 131, 923 A.2d 1111, 1117 (2007); *Batts II*, 620 Pa. at 131, 66 A.3d at 295. The General Assembly mandated the imposition of a single, maximum sentence of at least a term of life imprisonment for first-degree murder. *See, e.g.*, 18 Pa.C.S. § 1102(a) (subsequently amended Oct. 25, 2012); 42 Pa.C.S. § 9711; *Batts II*, 620 Pa. at 131, 133-34, 66 A.3d at 295, 297; *accord* 18 Pa.C.S. § 1102.1(a), (b); *Commonwealth v. Yount*, 419 Pa. Super. 613, 623, 615 A.2d 1316, 1321 (1992) (recognizing trial court could not sentence first-degree murderer to lesser term than life). That sentence was made "without parole" under the Prisons and Parole Code. *See* 61 Pa.C.S. § 6137(a)(1); *Batts II*, 620 Pa. at 131, 66 A.3d at 295-96. As noted in *Batts II*, this mandatory sentencing scheme applied to a juvenile-defendant when the trial court denied a petition for decertification under the Juvenile Act. *See* 42 Pa.C.S. §§ 6302, 6322(a); *Batts II*, 620 Pa. at 131, 66 A.3d at 295-96.

Following **Miller**, a trial court must impose a maximum sentence of life, but may impose a minimum sentence in a term of years. **See Batts II**, 620 Pa. at 133-34, 66 A.3d at 296; **cf.** 18 Pa.C.S. § 1102.1(a). The trial court may also impose a maximum term of life imprisonment and, after consideration of age-related factors, withhold the possibility of parole at the time of sentencing. **See Knox**, 50 A.3d at 735; **cf.** 18 Pa.C.S. § 1102.1(d).

Although the determination of an appropriate minimum sentence is amendable to analysis under Pennsylvania's traditional sentencing scheme, the denial of the possibility of parole remains a novel and evolving issue.[2] The imposition of a juvenile life-without-parole sentence, in my view, requires different considerations. **Cf. Commonwealth v. Lawrence**, 99 A.3d 116, 122 (Pa. Super. 2014) (describing juvenile life-without-parole sentence as "preventing a juvenile . . . from ever obtaining any hope of release from confinement"); **accord Miller**, ___ U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 24 ("Life without parole 'forswears altogether the rehabilitative ideal.' It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change."). Moreover, factors such as the protection of the public, the gravity of the offense in relation to the impact on the victim and the

---

[2] For example, under Section 1102.1(d), which does not directly govern this case, **see Batts II**, 66 A.3d at 294, a juvenile life-without-parole sentence may be imposed so long as the trial court "consider[s] and make[s] findings on the record" of "age-related characteristics of the defendant" along with six other factors. **See** 18 Pa.C.S. § 1102.1(d)(7).

community, and the defendant's rehabilitative needs are implicitly considered by the fact that a juvenile-defendant convicted of first-degree murder will be subject to some form of supervision by the Commonwealth for life. *See* 42 Pa.C.S. § 9721(b); *Commonwealth v. Walls*, 592 Pa. 557, 569, 926 A.2d 957, 964 (Pa. 2007).

Conversely, *Miller* and *Batts* ended decades of sentencing under the mandatory life-without-parole scheme for juveniles convicted of first-degree murder. Indeed, our prior law provided no meaningful basis to challenge a sentence withholding the possibility of parole.

Turning to the specifics of this case, I disagree with the Majority that Appellant's claims regarding the consideration of age-related factors have been waived under Pa.R.A.P. 2119(f). *See* Majority Slip Op. at 21. A sentence for murder is not a felony or misdemeanor subject to the discretionary review process. *See* 18 Pa.C.S. § 106 (listing murder as a separate class of offense from felonies and misdemeanors); 42 Pa.C.S. § 9781(b) ("The defendant or the Commonwealth may file a petition for allowance of appeal of the discretionary aspects of a sentence for a felony or a misdemeanor to the appellate court that has initial jurisdiction for such appeals."); Pa.R.A.P. 2119(f); *Commonwealth v. Tuladziecki*, 513 Pa. 508, 513, 522 A.2d 17, 19 (1987) (Rule 2119(f) "furthers the purpose evident in the Sentencing Code as a whole of limiting any challenges to the trial court's evaluation of the multitude of factors impinging on the

sentencing decision to exceptional cases."). Moreover, the standards and procedures for sentencing a juvenile to life without parole do not arise from the Sentencing Code. *See* 42 Pa.C.S. § 9781(b) (requiring petitioning party to show substantial question that sentence imposed in not appropriate under [the Sentencing Code]). Lastly, our assessment of the requirement that a trial court "consider" age-related factors when imposing a juvenile life-without-parole sentence raises a sufficiently extraordinary legal question to warrant review despite a procedural default. Therefore, I would decline to find Appellant's issues waived under Rule 2119(f).

Our standard of review is as follows:

> [T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless "the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." In more expansive terms, ["a]n abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous."

*Walls*, 592 Pa. at 564, 926 A.2d at 961 (citations omitted). However,

> [t]he grant of broad discretion does not render the sentence imposed immune to challenge in the appellate courts:
>
> > [The] deference paid to the trial court does not necessitate a rubber stamped approval of the sentences imposed by the sentencing court. Appellate review of sentencing matters would

- 8 -

become a mockery and a sham if all sentences were routinely affirmed under the guise of discretion of the trial court. Further, it must be considered our function to review sentences in a more detached manner so that we can ensure not only a fair and impartial sentence under the circumstances, but also to protect against grossly disparate treatment of like offenders throughout the Commonwealth.

*Commonwealth v. Vega*, 850 A.2d 1277, 1281 (Pa. Super. 2004) (citation omitted). Further, where, as here, the presiding judge at sentencing is not the trial judge, "many of the factors justifying the deference normally accorded to the sentencing court are not present . . . ." *Commonwealth v. Billicki*, 355 Pa. Super. 416, 419, 513 A.2d 990, 991 (1986) (citations omitted).

Instantly, the trial court set forth a thorough summary of its findings of fact, conclusions of law, and explanation of its sentence over sixty pages of transcript. *See* N.T., 5/2/14, at 6-66. After summarizing approximately eleven aggravating factors and four mitigating factors, the court determined "the factors not in [Appellant's] favor significantly outweigh the factors in his favor." *See id.*, at 64-65. Under ordinary circumstances, such diligence on the part of a trial court alone provides a basis for not disturbing its exercise of discretion. *See Commonwealth v. Begley*, 566 Pa. 239, 302, 780 A.2d 605, 643 (Pa. 2001) ("As long as the trial court's reasons demonstrate that it weighed the Sentencing Guidelines with the facts of the crime and the defendant's character in a meaningful fashion, the court's sentence should not be disturbed."). Nevertheless, a closer inspection of the trial court's

findings of facts and conclusion of law reveals two gaps in the court's reasoning.

First, the trial court, in my view, properly set forth the threshold issue when imposing a juvenile life-without-parole sentence—that is, the distinction "between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the ***rare*** juvenile offender whose crime reflects irreparable corruption." ***See Miller***, ___ U.S at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 36 (emphasis added); N.T., 5/2/14, at 66. However, its specific conclusions that it would "give [Appellant] only limited consideration for his youth and immaturity," and its holding that "[w]here defendant actively seeks out and welcomes peer pressure, the peer pressure does not diminish his culpability" requires further comment. ***See*** N.T., 5/2/14, at 47, 49, 52.

In limiting its consideration of youth and immaturity, the trial court reasoned:

> Although there may be circumstances in which a crime can be partially explained by a young defendant's recklessness, poor judgment, lack of foresight, susceptibility to peer pressure, or weak impulse control, this was not such a crime. [Appellant] did not act on impulse. He was not caught up in youthful risk-taking behavior and lacked the ability to foresee how it might get out of control. [Appellant] made a purposeful choice to move out of his parents' home and commit himself to life in the Bloods gang. He knew from prior experience and observation that the Bloods gang was a violent criminal organization and that he would be asked to commit violent criminal acts. Four days after [Appellant] moved out of his parents' house, Bradley offered [Appellant] the opportunity

to prove himself by committing murder, and [Appellant] acted on the opportunity. He was not caught up in the heat of a stressful confrontation but had time to plan and deliberate. He placed a mask over his face, pulled gloves onto his hands, and picked up a handgun. He got out of the car and walked down the street toward the Edwards house. When he walked up the steps to the front porch with the gun in his hand, he was not acting on impulse or a lack of appreciation for what might happen next. He knew exactly what he was going to do. He made a calculated decision to shoot two defenseless boys at point blank range. He shot one boy in the back as he was running away. He shot the other boy twice in the head as he lay helpless on the porch and looking directly up into his face. This was not a crime that resulted from youthful impulsivity, a mistake in judgment, or inability to foresee the consequences of his actions. [Appellant] intended to kill, and he did kill. Whether he did so to earn a promotion or only to meet the gang's expectations, his intent was to prove to his fellow criminals that he was willing to commit a cold-blooded murder.

I am not suggesting that premeditated murder can never be considered impulsive for purposes of sentencing. There might well be circumstances under which premeditated murder could be the product of poor judgment, lack of foresight, susceptibility to peer pressure, and weak impulse control. That is not the case here.

N.T., 5/2/14, at 46-47. The court further emphasized that although a senior gang member, Vernon Bradley, "invited" the commission of the crime, Appellant agreed to do so and "acted alone". *See id.* at 57. Appellant was fourteen years old at the time of the crimes.

The trial court was entitled to consider the callous and deliberate nature of Appellant's killing of sixteen-year-old Clarence Edwards and shooting eighteen-year-old Corey Hilario in the back. Similarly, the court's findings that Appellant's association with the Bloods and his decision to "act

alone" were "volitional" rebut Appellant's claim of duress. However, the fact that Appellant made conscious choices between the ages of twelve and fourteen does not necessarily diminish the distinctive attributes of youth. *Cf. Miller*, ___ U.S. at ___, 132 S. Ct. at 2464-65, 183 L. Ed. 2d at 20-21 ("children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers" (internal quotation marks omitted)).

The evidence at the resentencing hearing established a "troubled childhood" that included Appellant's removal from his young mother's care[3] when he was five years old. *See* N.T., 5/2/14, at 41. He moved "frequently from one home to another" and spent time in foster homes, as well as a homeless shelter for youths. *See id.* According to the trial court's summary of the facts, Appellant returned to his mother and stepfather's care at the age of twelve, when he was in the seventh grade. *Id.* at 42. Appellant befriended a Blood, who was subsequently imprisoned. *Id.* at 25. When in eighth grade, Appellant "was approached by the Bloods and invited to join the gang." *Id.* The trial court noted, "Because [Appellant's] own family life had been fractured, he found gang life appealing." *Id.*

---

[3] Appellant's mother was thirteen when Appellant was born. N.T., 5/2/14, at 16.

When Appellant was in the ninth grade, approximately two years after reuniting with his mother, Appellant moved out of her home following a family dispute. *Id.* at 42. He stayed with gang members after leaving home. *Id.* at 27. Appellant met Bradley, a more senior Blood, who "invited" him to confront Edwards. *See id.* at 47. Four days later, Appellant and Bradley were in a car with other Bloods and Bradley asked who wanted to "put in work." *See id.* at 14, 47. Ultimately, Appellant agreed, and Bradley "gave him a mask and a handgun." *Id.* at 14. Appellant put on a glove, approached the victims' home, shot Hilario in the back as Hilario fled into the house, and shot Edwards twice in the head after Edwards fell to the ground. *Id.* at 14, 27-28. Appellant was fourteen years old when he committed the murder and attempted murder.

These were horrific crimes. However, the court finding that Appellant "acted alone" ignored the totality of circumstances under which Appellant met Bradley, Bradley instigated Appellant to undertake the criminal acts, and Bradley gave Appellant the weapon.[4]

Further, Appellant's descent into gang association after returning to his mother's care at the age of twelve and the commission of the crime at the age of fourteen correlate with the distinctive attributes of youth. The

---

[4] At trial, Appellant testified that no one in the car responded after Bradley asked, "Who's going to put work in?" N.T., 7/30/07, at 64. Bradley asked again and no one responded. *Id.* Bradley then handed the gun and mask to Appellant and stated, "Blood, I just brought you home. You can't put work in for me?" *Id.* at 65.

Commonwealth's expert, Dr. Timothy J. Michals, testified at trial that Appellant was not forced to join a gang, but "there was a need on his part to belong to something, and he made the choice of going in that direction." N.T., 7/26/07, at 160-61. Nevertheless, Dr. Michals opined Appellant exhibited "rash and impulsive willingness to court danger and risk harm. He acts fearless in the face of threats and punitive action." *Id.* at 166. Dr. Steven E. Samuel, another Commonwealth expert at the decertification hearing, opined that Appellant was "vulnerable to the demands of an older, more powerful male." Report by Steven Samuel, Ph.D., 1/12/07, at 6. Appellant's defense experts, Dr. Frank M. Datillio, and Dana Cook, both suggested Appellant was vulnerable to gang influences. Report by Frank M. Datillio, Ph.D., 11/21/13, at 15; Addendum to Report by Dana Cook, M.S., 12/31/13, at 3 (unpaginated). The court further credited the testimony of Dr. Susan E. Kraus, a county psychologist, who evaluated Appellant for the presentence report. She testified that Appellant was willing "to do anything to become accepted as a successful gang member, including the commission of murder." N.T., 5/2/14, 46, 52. Even if Appellant's decision to join the Bloods was "volitional," it was the purposeful decision of a juvenile who was then twelve or thirteen years old.

Further, the trial court's own findings that Appellant's criminal actions were "out of character" for him, belie its determination to devalue the attributes of youth. N.T., 5/2/14, at 51-52. Before the shootings, Appellant

- 14 -

had no prior criminal record, but engaged in fights, and began to use and sell drugs. *Id.* at 37, 44, 51. After the shootings, Appellant had six disciplinary infractions while incarcerated, including a fight in 2010 and throwing liquid at another inmate in 2014. *Id.* at 34-35, 51. However, as the court observed, those episodes did not approach the level of violence displayed in the instant crimes. *Id.* at 51-52. Thus, the trial court's discounting of Appellant's youthful attributes and susceptibility to gangs as it related to his culpability lacked support in the record.

Second, the trial court noted that all the experts at resentencing agreed that Appellant "demonstrated some capacity for change in recent years." *Id.* at 54. It observed the Commonwealth's expert, Dr. Michals, stated Appellant was resistant to treatment and had limited potential for rehabilitation due to "chronic psychological maladjustment." N.T., 5/1/14, at 49, 59. Dr. Michals also suggested Appellant "is who he is[,]" and described Appellant as being "impulsive," possessing "poor judgment," and engaging in "acting out" behavior. N.T., *Id.* at 49-50. Dr. Michals concluded, "Characteristics can change but it's very difficult to make changes to the basic structure of . . . personality." *Id.* at 59.

However, the court also noted Appellant's two experts and an independent evaluator opined Appellant was amenable to rehabilitation. N.T., 5/2/14, at 54. Specifically, Dr. Datillio stated Appellant has "the capacity to change," "the desire is genuine," and his "remorse is genuine."

N.T., 5/1/14, at 110. Ms. Cook opined Appellant has "an extraordinary amount of potential to be a law-abiding member of society . . . ." Report by Dana Cook, M.S., 12/31/13, at 4 (unpaginated). Dr. Kraus determined Appellant "'appear[ed] to have made significant changes in his thinking and behavior over his years in prison and at this point appears competent and amenable to treatment.'" N.T., 5/2/14, at 53. Dr. Kraus opined that Appellant would need supervision if released. *Id.*

The trial court determined Appellant's "young age weigh[ed] ***slightly*** in [his] favor in assessing [his] amenability to treatment and rehabilitation and [his] rehabilitation and [his] capacity for change." *Id.* at 61 (emphasis added). It concluded that it could not "be confident of significant change . . . without years of therapy" or "an extended period of incarceration." *Id.* at 54, 59-60.

In my view, the trial court's findings and conclusions contradict the principle that "youth matters" because of the innate ability of a juvenile to change and mature. *Cf. Miller*, ___ U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 21 ("a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'"). The court heard evidence that fourteen was a critical age as Appellant was "just forming [his] sense of self, [his] sense of judgment and reason." N.T., 5/1/14, at 107. Further, although the court purported to consider 18 Pa.C.S. § 1102.1, it did not discern the General

- 16 -

Assembly's policy decision that youth particularly matters when the juvenile-defendant is younger than fifteen when he commits the crime. ***See*** 18 Pa.C.S. § 1102.1(a)(1)-(2) (reducing mandatory minimum sentence from thirty-five years for those aged fifteen or older to twenty-five years for those under age of fifteen).

The trial court, moreover, framed its choice as two extremes: the Commonwealth's recommendation that Appellant be sentenced to life without parole, and Appellant's request for a sentence of twenty-five years to life as suggested by 18 Pa.C.S. § 1102.1. ***See*** N.T., 5/2/14, at 56. ***But see Batts II***, 620 Pa. at 127 66 A.3d at 293. There was no meaningful consideration of a minimum term of incarceration, above the twenty-five year minimum sentence it rejected.[5] ***See*** N.T., 5/2/14 at 64; ***cf.*** 18 Pa.C.S. § 1102.1(e) (permitting trial court to sentence above mandatory minimum sentence).

Similarly, the trial court suggested that a sentence less than life without parole would be an act of "leniency" or "mercy," which would depreciate the seriousness of the offense and impact on the victims. The court, *inter alia*, referred to sentencing factors that "weigh against leniency,"

---

[5] Appellant presents a compelling argument that although the trial court recognized a long-term possibility for rehabilitation and reform, its decision to reimpose a sentence of life without parole could have the effect of making treatment less available to Appellant during his incarceration. Appellant's Brief at 87.

and opined that "[c]ompassion for [Appellant] does not diminish the needs of the victim and the community to see that justice is done." **See** N.T., 5/2/14, at 56, 67-68. After imposing its sentence, the court posed a rhetorical question whether Appellant's family would ask for mercy if the Appellant had been killed.[6] **Id.** at 68. Shortly thereafter, it concluded the resentencing proceeding, stating, "Mercy for [Appellant] will have to come from God. God have mercy on [his] soul." **Id.** at 68.

The court misperceives the nature of our indeterminate sentencing scheme by viewing an appropriately crafted definite minimum sentence as lenient. **See Yuhasz**, 592 Pa. at 131, 923 A.2d at 1117-1118; **Commonwealth v. Daniel**, 430 Pa. 642, 647-48, 243 A.2d 400, 403 (1968) ("[T]he maximum sentence is the only portion of the sentence which has legal validity, and that the minimum sentence is merely an administrative notice" regarding the availability of parole.) An appropriate minimum sentence would create no right to release on parole. **See Rogers v. Bd. of Prob. & Parole**, 555 Pa. 285, 292, 724 A.2d 319, 323 (1999); **Commonwealth v. Kleinicke**, 895 A.2d 562, 572 (Pa. Super. 2006) (*en*

---

[6] The presiding judge also related an incident when his law clerk stated, "Have mercy," after which the presiding judge visited the crime scene before imposing sentence. N.T., 5/2/14, at 67-68. The judge parked in front of the victims' home, imagined Appellant shooting Hilario and Edwards, and pondered the effects of the crime upon Edwards' grandmother. **Id.** Such personal identification with the victims, as human as that is, does not reflect a dispassionate and impartial weighing of the impact of the offense against the attributes of youth.

*banc*). Parole requires further assessments. Parole would only be granted after "a prisoner has demonstrated to the Parole Board's satisfaction, his future ability to function as a law-abiding member of society." *See Rogers*, 555 Pa. at 292, 724 A.2d at 322-23. If granted, release would be conditional, and the juvenile-defendant would remain subject to supervision by the Commonwealth. Thus, I believe the court did not properly assess the possibility of Appellant's rehabilitation or consider the sentencing alternatives available to it.

In sum, I would conclude the record reveals an abuse of discretion when imposing a life-without-parole sentence. The trial court's discounting of Appellant's youthful attributes and susceptibility to peer pressure lacked support in the record. The court failed to recognize the inherent possibility and record evidence of a fourteen-year-old offender's potential for rehabilitation. Further, it did not consider the sentencing alternatives. Therefore, I would remand this matter for resentencing.